**Vasser BISHOP, as Executrix of the Estate of David H. Bishop, Deceased, Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

**No. WC 6943.**

United States District Court, N. D. Mississippi, W. D.

June 19, 1970.

11. See Treasury Regulations § 1.537–3(b).

No. 2, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

ORMA R. SMITH, District Judge.

This case is before the Court on plaintiff's Motion For Summary Judgment and on defendant's Cross-Motion For A Summary Judgment on the First and Second Counts of the complaint. The Third Count of the complaint is not involved in either of the motions aforesaid.

Dr. David H. Bishop and his wife, Mary H. Bishop, resided for many years at Oxford, Mississippi, where Dr. Bishop was engaged as a professor at the University of Mississippi. Mrs. Bishop died October 3, 1961, at the age of 76 years. Dr. Bishop died January 9, 1963, at the age of 92 years.

Mrs. Bishop [1] left a Last Will and Testament by which she devised and bequeathed her estate to Dr. Bishop, should he survive her, if not, to her three daughters.[2]

Dr. Bishop, as the executor of his wife's estate, filed an Estate Tax Return (Form 706) with the Jackson, Mississippi Office of the Internal Revenue Service on February 21, 1962. In Schedule E (Jointly Owned Property) of the return, the Executor listed jointly owned and held stocks and bank accounts.[3] The schedule reflects that the Securities were held by the Decedent and Dr. Bishop as "joint tenants with the right of survivorship". The schedule contained two groups of Securities. One group, said to contain Securities inherited by Decedent from her mother, were listed at full value. The other group, said to

Lomax B. Lamb, Jr., Marks, Miss., Thomas R. Ethridge and Lowell E. Grisham, of Ethridge & Grisham, Oxford, Miss., for plaintiff.

H. M. Ray, U. S. Atty., Oxford, Miss., Jack D. Warren, Refund Trial Section

1. Mrs. Bishop will be referred to in this opinion as the "Decedent".

2. The pertinent parts of the decedent's will dated July 5, 1958, are:
   "To my husband, David H. Bishop, I give my entire estate now in joint ownership of David H. Bishop and Mary R. Bishop with right of survivorship, appointing him executor.

   In event my husband does not survive me I give my estate, not including home, to my daughters, Vasser Bishop, Mary Hartwell Howorth and Martha Bishop Henton, share and share alike, and name Vasser executrix.
   To Vasser I leave the home."

3. For convenience stocks and bank accounts will be sometimes referred to in this opinion as "Securities".

have been acquired by the Decedent and Dr. Bishop through joint effort and contributions, were listed at one-half the full value. The total value of the Securities listed under Schedule E of the return was $166,929.21.

Schedule M (Bequests, etc., To Surviving Spouse—Marital Deduction) of the return lists the entire estate of the value of $172,929.21. The entire estate passed to Dr. Bishop by the Will of the Decedent. The Executor deducted from the value of the entire estate the sum of $82,838.25, representing the value of certain Securities said to have been disclaimed and released by Dr. Bishop to the contingent legatees of Decedent. The deduction of this amount left a total of $90,090.96, which amount was further reduced by federal and other death taxes payable out of the interest passing to Dr. Bishop, as the surviving spouse, under the Will. Thus, the net value of that part of the marital deduction, constituting property passing to Dr. Bishop as the surviving spouse, after deducting the value of the property disclaimed by him, amounted to $86,687.54.

Schedule O, the Recapitulation Schedule of the return, reflects an adjusted gross estate in the sum of $167,270.-48. The Executor reduced this amount by one-half, or $83,635.24, the maxi-

mum marital deduction to which the estate was entitled.

The funeral expenses, administration expense and debts of the decedent amounted to $5,658.73. Thus, the total allowable deductions amounted to $89,-293.97. Deducting this amount and the exemption of $60,000.00, resulted in a taxable estate of $23,635.24. The estate tax due on the return was $2,108.93.

On November 27, 1961, after the death of Mrs. Bishop, but before the estate return was filed, Dr. Bishop executed a disclaimer and release by which he undertook to disclaim and renounce any interest which he had, as the surviving registered joint owner, in a portion of the Securities shown in the Estate Tax Return and listed under Schedule E thereof.

In the disclaimer Dr. Bishop referred to the Securities covered thereby as being stocks inherited by Decedent from her parents. The disclaimer was executed in favor of the three daughters of Dr. Bishop and Decedent, contingent legatees of Decedent. The Securities, prior to Decedent's death, were held by her and her husband as joint tenants with the right of survivorship. The disclaimer recited that it was the intention of Dr. Bishop to comply with the provisions of Sections 2056(d) of the Internal Revenue Code of 1954,[4] and Sections 672–71

---

4. 26 U.S.C.A. § 2056(d). This subsection provides in part:

"(d) Disclaimers.—

(1) By surviving spouse.—If under this section an interest would, in the absence of a disclaimer by the surviving spouse, be considered as passing from the decedent to such spouse, and if a disclaimer of such interest is made by such spouse, then such interest shall, for the purposes of this section, be considered as passing to the person or persons entitled to receive such interest as a result of the disclaimer."

See also 26 U.S.C.A. § 2056(e), in which its pertinent parts provide:

"(e) Definition.—For purposes of this section, an interest in property shall be considered as passing from the decedent to any person if and only if—

(1) such interest is bequeathed or devised to such person by the decedent;

(2) such interest is inherited by such person from the decedent;

. . . . .

(4) such interest has been transferred to such person by the decedent at any time;

(5) such interest was, at the time of the decedent's death, held by such person and the decedent (or by them and any other person) in joint ownership with right of survivorship;

(6) the decedent had a power (either alone or in conjunction with any person) to appoint such interest and if he appoints or has appointed such interest to such person, or if such person takes such interest in default on the release of non-exercise of such power; . . . ."

through 672–81, Mississippi Code, 1942, Ann. Recompiled.[5]

Contemporaneously with the disclaimer Dr. Bishop transferred a portion of the Securities listed in Schedule E of the return to the First National Bank of Memphis in trust for the use and benefit of his three daughters. The aggregate value of these Securities was $63,000.00.

A short time later on January 29, 1962 Dr. Bishop executed a supplement to the original disclaimer, disclaiming and releasing to his said daughters, any interest which he had, as surviving registered joint owner and as legatee of decedent, in a portion of the securities shown on Schedule E of the return. Unlike the original disclaimer the supplement thereto described the Securities therein disclaimed as stocks owned equally by Dr. Bishop and Decedent.

Contemporaneously with the execution of the supplement to the original disclaimer, Dr. Bishop transferred additional Securities of the value of $27,-000.00 to the First National Bank of Memphis to be held and administered under the trust indenture hereinbefore mentioned. The disclaimers were executed and recorded in all respects as required by Mississippi Statutes. (Release Of Powers Of Appointment Act, Mississippi Code, 1942, Ann., Recompiled §§ 672–71 et seq.)

As has been hereinbefore mentioned, subsequent to the execution of the disclaimers, on February 21, 1962, Dr. Bishop filed the Estate Tax Return for the estate of the Decedent. With reference to the deduction of $82,833.05 shown in Schedule M of the return, Dr. Bishop described the deduction as being justified in the language as follows:

"By written instrument executed on November 27, 1961, and recorded in Book 314, at page 251, of Chancery records of Lafayette County, Mississippi, and a supplement thereto executed January 29, 1962, and recorded in Book , at page , of the Chancery records of Lavayette County, Mississippi, surviving spouse disclaimed and released to contingent legatees of decedent the following stocks:"

On January 30, 1962, before the filing of the Estate Tax Return for the estate

---

5. Sections 672–72 and 672–73, Miss.Code 1942 Ann. Recompiled, provide:
   "§ 672–72 Definitions.
   When used in this act unless the context otherwise requires:
   (a) 'Power' includes any power to appoint or designate to whom property shall go, any power to invade property, any power to alter, amend or revoke any instrument under which an estate or trust is held or created or to terminate any right or interest thereunder, and any power remaining where one or more partial releases have heretofore or hereafter been made with respect to a power, whether heretofore or hereafter created or reserved, whether vested, contingent or conditional and whether classified in law or known as a power in gross, a power appendant, a power appurtenant, a collateral power, a general, special or limited power, or exclusive or non-exclusive power, or otherwise, and irrespective of when, in what manner, or in whose favor, it may be exercised.
   (b) 'Donee' means any person whether resident or nonresident of this state, who, either alone or with another, has the right to exercise a power.

(c) 'Objects' when used in connection with a power means the person in whose favor the power may be exercised.
   (d) 'Property' when used in connection with a power means any and all property, whether real or personal, any and all interest in property, and any and all income from property, which is subject to the power, and includes any part of the property, any part of the interest in property, and any part of the income from property.
   (e) 'Release' means renunciation, relinquishment, surrender, refusal to accept, extinguishment, and any other form of release".
   "§ 672–73. Right to release.
   Unless the instrument creating the power specifically provides to the contrary, the donee of a power, whether now existing or hereafter created, may;
   (a) At any time completely release his power.
   (b) At any time or times release his power: (one) As to any property which is subject thereto; (two) As to any one or more of the objects thereof; or (three) So as to limit in any other respect the extent to which it may be exercised."

of Decedent, Dr. Bishop filed with the Jackson, Mississippi office of Internal Revenue Service a Gift Tax Return for the year 1961. Dr. Bishop included as a taxable gift for the calendar year 1961, the transfer of Securities amounting to $63,000.00 to the First National Bank of Memphis by his trust indenture of November 27, 1961. Dr. Bishop did not mention or in any way refer to the disclaimer of November 27, 1961, nor did he attach a statement to the return regarding such transaction. The return was entirely silent in regard to the disclaimer. After deducting the exclusions to which Dr. Bishop was entitled and the specific exemption of $30,000.00 there was no tax due by Dr. Bishop on the return for that year.

After Dr. Bishop's death plaintiff, as the Executrix of his estate, filed a gift tax return for the estate for the calendar year 1962. The return was filed with the Jackson, Mississippi office of the Internal Revenue Service on February 26, 1963. Plaintiff reported the additional Securities transferred by Dr. Bishop during 1962 to the First National Bank of Memphis under the trust indenture aforesaid, amounting to $27,000.00. After deducting the exclusions to which Dr. Bishop was entitled, the estate paid a tax of $165.00 on taxable gifts of the value of $6,000.00. The return for the calendar year 1962 omitted reference of any kind to the supplement to the disclaimer, which supplement was executed during the calendar year 1962.

The Estate Tax Return for decedent's estate was processed in the Jackson, Mississippi office by an Estate Tax Examiner.[6] In the course of examining the return, the Agent received knowledge of and reviewed the facts relative to the disclaimers executed by Dr. Bishop during the calendar years 1961 and 1962.

Pursuant to a prior request, copies of the disclaimers were sent to the Agent by the attorney for the estate. The disclaimers were discussed on several occasions by the agent and the attorney for the estate. Suffice it to say that the Agent charged with the responsibility of examining decedent's Estate Tax Return was fully informed in respect to the disclaimers.

In the District Director's closing letter on the Estate Tax Return he made reference to the disclaimers. It is important to note, however, as mentioned in a letter written on December 30, 1963 to the attorney of the estate by the agent that the disclaimers had no bearing on the estate liability. The maximum marital deduction was obtained in any event.

On July 5, 1966[7] the Commissioner made deficiency assessments of gift taxes for both years. The Commissioner included in the 1961 return the Securities disclaimed by Dr. Bishop on November 27, 1961, and included in the 1962 return the Securities disclaimed by him on January 29, 1962. The Commissioner held that the disclaimers executed by Dr. Bishop for the years in question constituted transfers of property by gift within the meaning of Section 2501 of the Internal Revenue Code of 1954,[8] and were therefore taxable gifts.

---

6. The Estate Tax Examiner will be hereinafter referred to as the "Agent".

7. This date is more than three years after the Gift Tax Returns for the calendar years 1961 and 1962 were filed with the District Director.

8. The federal statutes involved in the questions presented to the Court by the summary motions of the parties are as follows:
"Internal Revenue Code of 1954 (26 U.S.C.):
SEC. 2501 [as amended by Sec. 4(d) (2) of the Act of 14, 1960, P.L. 86–779, 74 Stat. 998] IMPOSITION OF TAX.

(a) General Rule.—For the calendar year 1955 and each calendar year thereafter a tax, computed as provided in section 2502, is hereby imposed on the transfer of property by gift during such calendar year by an individual, resident or nonresident, except transfers of intangible property by a nonresident not a citizen of the United States and who was not engaged in business in the United States during such calendar year.
\* \* \* \* \*
SEC. 2511. *Transfers in general.*
(a) *Scope.*—Subject to the limitations contained in this chapter, the tax im-

It is not disputed that the Securities which were the subject of the alleged disclaimers exceed in amount twenty five per cent of the total amount of gifts stated in the return for each of the calendar years 1961 and 1962. For this reason the District Director contended that the six-year rather than the three-year statute of limitations applied to the assessments.

The Securities involved were transferred from the joint ownership of Dr. Bishop and Decedent to the contingent legatees and were never transferred to Dr. Bishop after his wife's death, before being transferred to the contingent legatees.

Plaintiff paid the deficiency assessments. The amount of the assessment with interest on the 1961 return was $11,089.72. The amount of the assessment with interest on the 1962 return amounted to $8,267.98. After having paid the assessments plaintiff filed a timely claim for refund with the District Director, who disallowed the claim. Plaintiff has filed this action to recover the amount paid by her on the assessments aforesaid with statutory interest.

The pending motions present two questions for the Court's consideration. These are:

1. Whether the documents entitled "Disclaimer and Release" executed by Dr. Bishop in 1961 and 1962 constitute transfers of property by gift within the meaning of Section 2501 of the Internal Revenue Code of 1954.

2. Whether defendant's assessments of gift taxes and interest for calendar years 1961 and 1962 are governed by the three-year statute of limitation, or by the six-year statute of limitation.

The Court will discuss these questions in the order mentioned.

## DO THE DOCUMENTS ENTITLED "DISCLAIMER AND RELEASE" EXECUTED BY DR. BISHOP IN 1961 AND 1962 CONSTITUTE TRANSFERS OF PROPERTY BY GIFT WITHIN THE MEANING OF SECTION 2501 OF INTERNAL REVENUE CODE OF 1954?

posed by section 2501 shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible; but in the case of a nonresident not a citizen of the United States, shall apply to the transfer only if the property is situated within the United States.

\*　　\*　　\*　　\*　　\*

SEC. 6501 [as amended by Sec. 165(a) of the Excise Tax Technical Changes Act of 1958, P.L. 88–859, 72 Stat. 1275].

*Limitations on assessment and collection*

(a) *General Rule.*—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

\*　　\*　　\*　　\*　　\*

(e) *Substantial omission of items.*—Except as otherwise provided in subsection (c)—

\*　　\*　　\*　　\*　　\*

(2) *Estate and gift taxes.*—In the case of a return of estate tax under chapter 11 or a return of gift tax under chapter 12, if the taxpayer omits from the gross estate or from the total amount of the gifts made during the year items includible in such gross estate or such total gifts, as the case may be, as exceed in amount 25 percent of the gross estate stated in the return or the total amount of gifts stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. In determining the items omitted from the gross estate or the total gifts, there shall not be taken into account any item which is omitted from the gross estate or from the total gifts stated in the return if such item is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item."

The statute imposes a tax "on the transfer of property by gift" by any individual. [26 U.S.C.A. § 2501(a) (1)] The tax imposed "shall apply whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible". [26 U.S. C.A. § 2511(a)].

The plaintiff contends and urges upon the Court that Dr. and Mrs. Bishop were equal, not joint, owners of the Securities. This contention is, of course, made in the very teeth of the actual estate created by the phraseology utilized when the Securities were issued. The estate created by the phraseology used is a joint estate with the right of survivorship, or rather an estate by the entirety, as the joint owners were husband and wife.[9] Regardless of the apparent estate created, plaintiff contends that the acts of the joint owners clearly demonstrate that they considered the estate as one in common.

Plaintiff urges upon the Court to support her contention that the statements made by Dr. Bishop in his Will that "all of our material possessions are owned in common by my wife and myself, share and share alike", and that "the greater part of our estate is invested in stocks" show that Dr. and Mrs. Bishop intended to hold their securities as tenants in common, rather than as joint tenants.

Plaintiff also urges that the Court should consider as evidence of the common ownership of the stocks the fact that decedent undertook to dispose of her interest in the joint estate. In the Will Decedent provided: "To my husband, David H. Bishop, I give my entire estate now in joint ownership of David H. Bishop and Mary H. Bishop (the Decedent) with right of survivorship, appointing him executor".

There is a letter in the record, dated August 23, 1963, addressed to the attorney, handling the legal affairs of both estates, written by a representative of a stock firm who handled Dr. Bishop's stock account for many years prior to his death. The letter states that in connection with the account the writer dealt only with Dr. Bishop and not with the Decedent; that for many years before Decedent's death the account was carried in the name of both Dr. Bishop and Decedent, as joint tenants with the right of survivorship; that the firm required the joint tenancy form to be signed on all such accounts by both parties to the agreement, but did not make inquiry about the source of money used in the purchase of stocks for an account in joint tenancy; that Dr. Bishop referred to the account on many occasions as "our account", meaning the account of Dr. Bishop and Decedent; and that there was nothing in his dealings with Dr. Bishop which indicated other than Dr. Bishop considered that he and Decedent owned equal interests in the account, or that the joint tenancy registration was undertaken for any purpose other than convenience in the transfer of stocks upon the death of either spouse. This letter, as will be noted, does not contain any affirmative information that the intention of Dr. Bishop was other than that the stock, sold by the writer of the letter to Dr. Bishop, was to be held by Dr. Bishop and Decedent as joint tenants. The letter has no probative value in the case.

Plaintiff urges upon the Court to consider the fact that Dr. Bishop stated in the disclaimer executed by him on January 29, 1962 that he and his wife "owned all of their interests in corporations listed below equally"; also the fact that Dr. Bishop, in his discussions with the attorney for the estate after his wife's death, indicated that he was un-

---

9. Wolfe v. Wolfe, 1949, 207 Miss. 480, 42 So.2d 438, the court said with regard to such estates:

"The common law favored joint tenancies. Under it a conveyance to two or more persons not husband and wife created a joint tenancy; if to husband and wife, an estate in entirety. To create an estate in common, it was necessary to add restrictive or explanatory words showing an intent to create such an estate." (42 So.2d at 438, 439)

der the impression that he and decedent owned their Securities in equal shares—share and share alike, despite the fact that they were registered prior to her death in both their names as joint tenants. These expressions made by Dr. Bishop after his wife's death were self-serving, and, as such, cannot be considered by the Court.

In the final analysis the only competent evidence of probative value on the question of the severance of the joint estate held by the parties prior to decedent's death consists of statements made by them in their respective Wills. Note the above quotation from Dr. Bishop's Will. The decedent undertook in her Will to bequeath to Dr. Bishop the property held by her and Dr. Bishop in joint ownership with the right of survivorship, thus evidencing the fact that decedent believed that she held an interest in the joint estate which she could devise by her Will.

The Wills of Dr. Bishop and Decedent were holographic Wills, written in 1958, three years before the death of Decedent, yet neither Dr. Bishop or Decedent did anything before the death of Decedent to sever the joint estate.

It is recognized that "A joint tenancy may be terminated altogether by mutual agreement between the parties or by any conduct or course of dealing sufficient to indicate that all parties have mutually treated their interests as belonging to them in common".[10]

It is also recognized that "The severance must take place before the death of the cotenant who has alienated his interest, and before the remaining cotenant has become the owner of the whole by virtue of his right of survivorship, and, hence, where a conveyance by a cotenant does not take effect until after his death, there is no severance".[11]

In addition, "There can be no severance of a joint tenancy by devise, since the right of survivorship takes precedence thereof".[12]

The case of Bird v. Stein[13] is apposite to the case sub judice. In *Bird* the husband and wife acquired a plantation as joint tenants, with the right of survivorship. Upon the husband's death his will and codicil thereto were probated. The testator undertook to set up a trust in his property. He designated a daughter and son as trustees to carry out the provisions of the trust. The wife lived for two years after the death of her husband, and left a will, which was never probated and did not become effective. The contents of the will were material to the case only in so far as they had evidentiary value.

The trustees claimed that the trust never came into existence because the property which the testator designated as trust property became the property of his wife as the surviving tenant of the joint estate. The trustee's son undertook to rent the property from his mother after his father's death, and after her death, from the heirs of the estate. The heirs brought suit against the trustee for an accounting under the trust.

The court stated that the first and major question to arise in the estate was "Did the deed by which the property was acquired create a joint tenancy with the right of survivorship, and if it did, was there a termination of it during the life of V. A. Stein (the husband)".[14] In stating the contention of the parties the court said:

"Defendants urge it did so create and that it was not severed by conduct or otherwise. Plaintiffs say it did not create a joint tenancy under the Mississippi statute, but if it did it was severed and terminated during the life-

10. 48 C.J.S. Joint Tenancy § 4, at 928.

11. Id. at 928.

12. Id. at 928.

13. 102 F.Supp. 399, United States District Court for the Southern District of Miss., W.D. (1952).

14. 102 F.Supp. 401.

time of V. A. Stein by conduct and written instruments."[15]

In connection with the estate created by the deed the court said:

> "It is clear from the language of the deed that it was intended to create a joint tenancy and not tenants in common. More convincing language could not have been chosen, and from the entire language of the deed it is equally apparent that it was drawn by a lawyer or by one versed in legal phraseology. It must be assumed that the parties reduced to writing what they had in mind and what was intended when they chose this language. When a joint tenancy is created the right of survivorship follows as an incident thereto. A joint tenancy can be created only by the acts of the parties and as known at common law required unity of time, title, interest and possession.
>
> .    .    .    .    .    .
>
> Therefore upon the death of V. A. Stein the fee-simple title vested in Sarah Stein."[16]

The facts in Bird v. Stein, supra, show that the husband committed alone, during his lifetime; many acts of ownership over the property, and used it as a home for the family until his death. In his Last Will and Testament he undertook to devise to his wife for her life all of his right, title and interest in and to all of his property, both real, personal and mixed with the remainder in trust for his children and two named grandchildren. Shortly after executing his will the husband executed a codicil bequeathing all of his personal property not theretofore sold to his son, one of the trustees named in his Will. When the Will was probated there was no real estate left and very little personalty. Counsel for plaintiffs contended that by this course of conduct of the husband, there was a severance of the joint tenancy. The Court held that "Conduct and dealing of course under some circumstances can

sever such an estate.", [17] citing 48 C.J.S. Joint Tenancy § 4, at 927, 928.

In discussing whether the evidence in the case sustained a severance of the joint tenancy during the lifetime of the joint tenants the court said:

> "Usually and generally a severance which will defeat a joint tenancy means a separation of the interests of joint tenants, vesting of the interest of one, separated from the interest of the other, in some third person. Tindall v. Yeats, 392 Ill. 502, 64 N.E.2d 903. The course of dealing in this case fails to show that there was a severance or any intent for a severance."
>
> .    .    .    .    .    .
>
> .  .  .  Under some facts there could be a severance by conduct which would amount to an estoppel and the statute of frauds would not apply. However, such conduct or course of dealing is not present in this case. A severance from a joint tenancy to a tenancy in common is not a conveyance when it arises from the course of dealing, but is simply a change from one form of ownership to that of another form and arises by operation of law." [18]

The court in *Bird*, also discussed at length the nature of an estate by the entirety. The holding of the court seems to be quite appropriate in the case sub judice, as the joint estate with the right of survivorship held by Dr. Bishop and Decedent in the Securities in question was in reality an estate by the entirety. The *Bird* court said:

> "Counsel for defendants suggests but does not argue at length the most decisive and controlling point, which in my judgment, definitely settles the severance question. The conveyance here not only created a joint tenancy but also created an estate by the entirety and this is recognized by the statute of Mississippi and the decisions thereunder. In Sale v. Saunders, 24 Miss. 24, the Court said: 'The same

---

15. Id. at 401.

16. Id. at 401, 402.

17. Id. at 402.

18. Id. at 403.

words of conveyance which would make two other persons joint tenants, will make the husband and wife tenants of the entirety. Both are seized of the entirety, and neither can sell without the consent of the other, and the survivor takes the whole.

An estate by the entirety consists of five unities: time, title, interest, possession and marriage, all of which must coexist, while a joint tenancy possesses all these except marriage. Frederick v. Southwick, 165 Pa.Super. 78, 67 A.2d 802.

For a most exhaustive collection of authorities on this point see, Words & Phrases, Vol. 15, p. 327. Under the authorities there cited and collated it is clear that upon the death of V. A. Stein, Sarah, 'simply continued, in virtue of the nature of the tenancy, to possess and own what she already had.' Lilly v. Smith, 7 Cir., 96 F.2d 341, 343. In that case it was held that it is the conveyance to both of them, the husband and wife, that creates the estate which ripens into a fee-simple title upon the death of one. In the case at bar all five of the unities are present and under the Mississippi authority supra it follows that upon the death of V. A. Stein title to Little Hope Plantation vested in fee simple in Sarah Stein." [19]

In the case of Wolfe v. Wolfe,[20] the Mississippi Supreme Court considered the legal effect of two deeds. One deed conveyed certain real property "to Willis Wolfe and Della Wolfe and the survivor of them". The second deed conveyed other real property to the same parties making use of the phraseology as follows: "do hereby convey and warrant unto Willis Wolfe and his wife, Della Wolfe, and to the survivor of them." [21] In *Wolfe* the court said:

"We do not undertake to determine whether the estate created is one of joint tenancy or entirety. In either case the result is the same, the survivor took the entire property.[22]

. . . We think the deeds under consideration do manifest an intention to create an estate in joint tenancy and not an estate in common. The first conveys the property to the grantee 'and the survivor of them', the second conveys to them 'and to the survivor of them.' The two quoted expressions mean the same thing. The distinguishing and most important incident of title by joint tenancy is the doctrine of survivorship, *by force of which, upon the death of one joint tenant, the joint estate remains unimpaired with the survivor.* . . . If the grantees are held to be tenants in common, it is necessary to erase and eliminate the quoted provisions from the deeds. No proper exercise of judicial power would permit that. It is impossible to have the right of survivorship in an estate in common." (Emphasis supplied) [23]

The *Wolfe* case dealt with real property. The case of Duling v. Duling's Estate [24] dealt with the contents of a safety deposit box. The court held that money in a lock box was owned by the decedent and another under a joint tenancy agreement, and that the money was no part of the estate of the decedent. The court said:

"The trial court awarded $2,000 of the fund in question to Albert Duling upon the correct theory that the joint tenancy agreement controlled and that this fund was no part of the assets of the estate of Miss Duling." [25]

In Vaughn v. Vaughn,[26] another Mississippi case, the court considered the ownership of a promissory note and deed of trust which were payable to husband and wife. The opinion reveals that Vaughn, the decedent, during his lifetime, was engaged as a contractor.

19. Id. at 404.
20. 207 Miss. 480, 42 So.2d 438 (1949).
21. Id. at 438.
22. Id.
23. Id. at 439.
24. 211 Miss. 465, 52 So.2d 39 (1951).
25. Id. at 45.
26. 238 Miss. 342, 118 So.2d 620 (1960).

In the course of his work he constructed a church building. Vaughn made a loan to the church to finance the construction of the building. The church issued to Vaughn its note to evidence the debt and a deed of trust to secure payment of the note. The note and deed of trust were payable to Vaughn and his wife. The note was payable "to the order of E. J. Vaughn and (Mrs.) Inez Pickett Vaughn, or to the survivor of them." The beneficiary in the deed of trust was designated as "E. J. Vaughn and Mrs. Inez Pickett Vaughn, or the survivor of them". Vaughn retained both documents until his death, and did not deliver them to Mrs. Vaughn. They were among his effects at his demise. Mrs. Vaughn was appointed executrix of the estate. She accounted for the note and deed of trust as assets of the estate in the inventory and final account. Afterwards Mrs. Vaughn filed an amended account, in which she asserted ownership to the note and deed of trust.

Two questions were involved in the case relative to the note and deed of trust. One question was whether the phraseology used in the documents was sufficient to create a joint tenancy with right of survivorship. The other question was whether delivery of the note and deed of trust by the church to Vaughn, who retained them in his possession until his death, was sufficient to vest a right of joint tenancy in Mrs. Vaughn. The court answered both questions in the affirmative. We are not concerned in the case sub judice with the latter question. In regard to the former the court said:

> "The words used in Wolfe are substantially similar to those in the instant note and deed of trust. We think the reasons expressed in that case are sound and apply here. In brief, the note and deed of trust used words which create a joint tenancy with right of survivorship.[27]

.    .    .    .    .    .

In brief, we conclude that the delivery of the note and deed of trust to one of the joint payees, E. J. Vaughn, constituted also a constructive delivery of these instruments to the other payee, the wife. Vaughn held these instruments both for himself and for the joint payee, his wife. Upon his death, she as the surviving joint tenant, became vested with full title to them. That part of the lower court's decree holding to the contrary is reversed, and title to the note and deed of trust are adjudged to be in Mrs. Vaughn." [28]

The effect of the court's holding was that the note and deed of trust did not become an asset or a part of the estate of the decedent.

In support of her contention that the Securities were held as tenants in common by Dr. Bishop and Decedent, rather than as joint tenants, plaintiff cites two Mississippi cases.[29] Both are domestic relations cases. In *Keyes* the husband sued the wife for a divorce. The trial court awarded the husband a divorce and denied the wife any interest in property jointly owned by the parties. The property involved in the case included United States Government Series E Bonds in the sum of $20,000. The bonds were purchased by the husband from his personal funds but were issued in his name and that of his wife so that the bonds could have been surrendered for payment by either of them. The husband kept the bonds in his possession. The bonds were produced in court and reflected that they were co-owner bonds, payable to the husband or the wife. The court said:

> "The U. S. Government bonds were Series E Bonds and were what are commonly called co-owner bonds. They were payable to Harvey W. Keyes or Mignonne W. Keyes. . . . As to the U. S. Government Series E Bonds, between two co-owners, it is a question of fact, not of law, as to the extent of

27.  118 So.2d 620, at 622.

28.  Id. at 623.

29.  Keyes v. Keyes, 252 Miss. 138, 171 So. 2d 489 (1965) and Petersen v. Petersen, 238 Miss. 190, 118 So.2d 300 (1960).

the property interest of the co-owners. One co-owner may, as a matter of fact, be the sole owner, he may be half owner, or he may have some other fractional interest therein. Under the facts in this case, which show that the appellee purchased these bonds with his own funds and has had them in his possession since that time, he is the sole owner of the bonds. The chancellor was not in error in denying appellant any interest in these bonds. 31 Code of Federal Regulations, Money and Finance: Treasury § 315.13 (1949); United States v. Stock Yards Bank of Louisville, 231 F.2d 628 (6 Cir., 1956)." [30]

In *Keyes* the court was concerned with government securities, which are, of necessity, governed by governmental regulations. In reaching a decision the court relied upon a Sixth Circuit case. United States v. Stock Yards Bank of Louisville, 6 Cir. 1956, 231 F.2d 628.

In that case the question of estate held in Series E United States Savings Bonds by co-owners was presented to the court for its decision. The court held:

"This court has held that co-ownership by husband and wife of Series E Bonds is not the equivalent of tenancy by the entirety under state law, but rather is an estate the limitations and conditions of which are delineated by the terms of the contract and by federal law. . . .

For the same reasons that co-ownership cannot be equated to tenancy by the entirety, it cannot be equated to joint ownership. While co-ownership and joint ownership possess many of the same incidents, notably the right of survivorship, they are not the same. One of the important differences is that a co-owner may alone present the bond for redemption, receive payment in full, and thereby eliminate the other co-owner's interest in the bond, so far at least as the issurer is concerned. 31 Code Fed.Reg. § 315.45.

As between two co-owners, however, the regulations as well as judicial decisions have recognized that the extent of the property interest of each is a question of fact, not of law. One co-owner may as a matter of fact be the sole owner of the bond; he may be a half owner; he may have some other fractional ownership." [31]

It is clear that *Keyes* is inapposite to the case sub judice for two apparent reasons. First, the case dealt with government bonds. The conditions upon which such bonds may be surrendered are determined by government regulations. The courts have held that the ownership of such bonds is a question of fact, not of law. Secondly, *Keyes* involved questions arising during the lifetime of the co-owners. Such is not the case in the action sub judice.

*Petersen* affords plaintiff little comfort. *Petersen*, like *Keyes* involved a divorce action and the award of alimony and counsel fees to the wife. The evidence showed that the husband had acquired certain corporate stock, issued originally in his name only. Later the husband surrendered the stock and caused it to be reissued in his name and that of his wife, as joint tenants with the right of survivorship. The wife claimed that the husband made her a gift of a one-half interest in the stock. The trial court held on conflicting evidence that the husband made a valid gift of one-half of the stock in question to his wife. The Supreme Court affirmed the lower court holding on this issue. Plaintiff asserts that *Petersen* enunciates the Mississippi rule that the extent of property interests of joint owners and co-owners in stocks, bonds, and bank deposits is a question of fact, not of law. However, *Petersen*, like *Keyes* is inapposite to the case sub judice for the reason that the court in *Petersen* concerned the interest of joint tenants with the right of survivorship in the property while both tenants are living.

30. 171 So.2d at 491.

31. 231 F.2d 628 at 630, 631.

In the case sub judice Dr. Bishop simply continued, in virtue of the nature of the tenancy, to possess and own what he already had. Bird v. Stein, supra, 102 F.Supp. at 404.

■ The Court finds that upon the death of Decedent, Dr. Bishop, as the surviving joint tenant, became the absolute and unqualified owner in fee simple of the Securities in question, by virtue of the death of Decedent, and not by virtue of Decedent's Will; that the said Securities did not pass from Decedent to the said surviving tenant, but rather the estate which the surviving tenant held jointly with Decedent ripened, by virtue of Decedent's death, into an absolute, unqualified fee simple estate for the surviving joint tenant, and, finally, that no interest in and to said Securities, at any time, became a part of Decedent's probate estate.

Plaintiff asserts that Dr. Bishop executed the disclaimers pursuant to the provisions of Section 2056(d) of the Internal Revenue Code of 1954, (See footnote 4) and Sections 672-71 through 672-81, Mississippi Code, 1942, Annotated, Recompiled (See footnote 5), for which reason, the disclaiming of any interest which he had in the Securities subject to the disclaimer, did not constitute a taxable gift within the meaning of 26 U.S.C.A. §§ 2501 and 2511. The provisions of 26 U.S.C.A. § 2056 apply to "Bequest, etc., to Surviving Spouse", and the allowance of the marital deduction. Section 2056(d) relates to disclaimers in relationship to the marital deduction, and has no application to taxable gifts.

The Internal Revenue Code of 1954, 26 U.S.C.A. § 2514, deals with powers of appointment and concerns transfers under the Gift Tax Chapter of the Code. Section 2514(b) provides:

"(b) Powers created after October 21, 1942.—The exercise or release of a general power of appointment created after October 21, 1942, shall be deemed a transfer of property by the individual possessing such power. A disclaimer or renunciation of such a power of appointment shall not be deemed a release of such power."

Treasury Regulations Section 25.2511-1(c) provides:

"Where the law governing the administration of the decedent's estate gives a beneficiary, heir, or next-of-kin a right to completely and unqualifiedly refuse to accept ownership of property transferred from a decedent (whether the transfer is effected by the decedent's will or by the law of descent and distribution of intestate property), a refusal to accept ownership does not constitute the making of a gift if the refusal is made within a reasonable time after knowledge of the existence of the transfer. The refusal must be unequivocal and effective under the local law. There can be no refusal of ownership of property after its acceptance. Where the local law does not permit such a refusal, any disposition of the beneficiary, heir, or next-of-kin whereby ownership is transferred gratuitously to another constitutes the making of a gift by the beneficiary, heir, or next-of-kin."

The Mississippi "Release of Power of Appointment Act" (Footnote 5) provides for a release of a "power". The word "Power" is defined in the Act so as to include "any power to appoint or designate to whom property shall go". Section 672-72, Mississippi Code, 1942, Annotated, Recompiled. The Act has not been the subject of judicial interpretation by the Mississippi Supreme Court and this Court must give the Act the interpretation which he believes a Mississippi Court would give it.

■ The Court is of the opinion that the Act does not apply to the transfer of an interest in property which is owned absolutely and unqualifiedly by the person undertaking to release the power. The Act does not apply to absolute ownership.

The execution of the disclaimers by Dr. Bishop amounted to nothing more than a transfer of property owned absolutely by him, and constituted, in the

opinion of the Court, a transfer of property by gift, subjecting it to tax imposed by 26 U.S.C.A. § 2501.

DOES THE THREE OR THE SIX YEAR STATUTE OF LIMITATION GOVERN THE DEFENDANT'S ASSESSMENT OF GIFT TAXES FOR THE CALENDAR YEARS 1961 AND 1962?

Having reached the conclusion that the execution by Dr. Bishop of the disclaimers in 1961 and 1962 constituted transfers of property by gift, the Court must decide whether the three or the six year statute of limitation applies to the assessments made by defendant.

It is undisputed that the assessments were made more than three but less than six years after the returns were filed. It is conceded that the value of the property disclaimed by Dr. Bishop in each of the years in question exceeded in amount twenty-five per cent of the total amount of gifts stated in the return. The sole question presented is whether the gifts represented by the disclaimers should be taken into account in determining whether gifts of an amount in excess of twenty-five per cent of the total amount of gifts stated in the return have been omitted from the gifts shown in the returns. If such gifts were disclosed in the return or in a statement attached thereto in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such gifts, the three year statute applies, otherwise, the six year statute applies, unless the information received by the agent in processing Decedent's Estate Tax Return apprised the Secretary or his delegate of the gifts represented by the disclaimer in such manner as to be legally acceptable in lieu of actual disclosure on the returns or in an attachment thereto.

It is conceded by plaintiff that no reference was made in either the 1961 or the 1962 return, or in any attachment to the same, to the disclaimers executed by Dr. Bishop.

Section 6501(e) (2), Title 26 U.S.C.A. (See footnote 8) provides in part "In determining the items omitted from . . . the total gifts, there shall not be taken into account any item which is omitted from . . . the total gifts stated in the return if such item is *disclosed in the return, or in a statement attached to the return,* in a manner adequate to apprise the Secretary or his delegate of the nature and amount of such item". (Emphasis supplied)

While conceding that the gifts represented by the disclaimers were not disclosed in the returns for the calendar years 1961 and 1962 or in any statement thereto, plaintiff asserts that defendant was not prejudiced thereby or placed at any disadvantage in the collection of the taxes. Plaintiff bottoms her argument on the assertion that the agent, charged with the responsibility of processing the Decedent's Estate Tax Return, acquired full knowledge of the disclaimers; and, after fully reviewing the matter, indicated positive acceptance and approval of the Gift and Estate Tax Returns as filed. The record does not show that the agent indicated positive acceptance and approval of the Gift Tax Returns. The record shows that the agent accepted and approved the Estate Tax Return, with a slight variation brought about by revaluation of stocks. The question of the validity or non-validity of the disclaimers was not material to a decision as to the acceptance or rejection of the Estate Tax Return. Whether the defendant did or did not acquiesce in the executor's position in regard to the disclaimers did not affect in any respect the tax liability on the return.

The record reflects, as has been hereinbefore detailed, that the agent knew of the disclaimers and received copies thereof during the period he was processing the Estate Tax Return. In his letter of December 30, 1963 to the attorney for the estate the agent indicated that since Dr. Bishop died in 1963, he was going to research the matter further and determine whether Dr. Bishop's right to disclaim or not disclaim his interest in the jointly held stocks would affect his estate tax liability, or whether or not he incur-

red any gift tax liability, if the disclaiming of such jointly held stocks was legally improper.

In the closing letter the director said that "The surviving spouse under the terms of the decedent's will inherited the entire estate and after disclaiming stocks with a value of $82,838.25 still received the maximum marital deduction". It is interesting to note, also in the closing letter the director said "The decedent's last will and testament and the passing of the jointly held property with the right of survivorship resulted in a residue as such not existing".

It appears clear to the Court that defendant did not at any time before making the assessments precipitating this action, come to a conclusion on the question of whether the disclaimers executed by Dr. Bishop constituted the transfer of property by gift, thereby making the transfer subject to the gift tax.

Unless the information acquired in the examination of the decedent's Estate Tax Return satisfied the requirements of 26 U.S.C.A. § 6501(e) (2) with respect to disclosure of the nature and amount of each stock disclaimed, the six year statute of limitation must govern. At this point it is proper to note that the Gift Tax Returns were examined and processed by an agent different from the one processing the Estate Tax Return.

If the statute is applied as written, plaintiff's contentions must fail. The statute is not ambiguous. The language used in the statute is plain, simple and clear. The Court is not required to interpret the statute as it needs no interpretation.

The record in this case reflects that there was not a compliance with the statute. Dr. Bishop, when he filed the Gift Tax Return for 1961, and plaintiff, when she filed the return for 1962 for his estate, did not disclose the existence of the disclaimers in the returns, or in statements attached thereto. Thus should the matter end.

The Court has not found, nor has counsel cited, any reported case which holds

a contrary view. Plaintiff calls the Court's attention to Colony v. Commissioner of Internal Revenue, 1958, 357 U.S. 28, 78 S.Ct. 1033, 2 L.Ed.2d 1119; Phinney v. Chambers, 5 Cir. 1968, 392 F.2d 680; Taylor v. United States, 5 Cir. 1969, 417 F.2d 991, and Benderoff v. United States, 8 Cir. 1968, 398 F.2d 132.

In *Colony* the deficiencies were based upon the Commissioner's determination that the taxpayer understated the gross profits on sales of certain lots of land for residential purposes as a result of having overstated the "basis" of such lots by erroneously including in their cost certain unallowable items of development expense. There was no claim that the taxpayer had inaccurately reported its gross receipts, or that the returns were fraudulent. The Tax Court sustained the Commissioner. It held that substantial portions of the development costs were properly disallowed, and that these errors by the taxpayer had resulted in the understatement of the taxpayer's gross income by 77.2% and 30.7%, respectively, of the amounts reported for the taxable years 1946 and 1947. In addition the Tax Court held that in these circumstances the five-year period of limitation provided in Section 275(c) [The predecessor of 26 U.S.C.A. § 6501 (e) (2)] was applicable. The critical language in the statute involved in the case was "omits from gross income an amount properly includible therein". In discussing the Commissioner's viewpoint that the draftsman's use of the word "amount" (instead of, for example, item) suggests a concentration on the quantitative aspects of the error, that is, whether or not gross income was understated by as much as twenty-five per cent, the court said:

"This view is somewhat reinforced if, in reading the above-quoted phrase, one touches lightly on the word 'omits' and bears down hard on the words 'gross income,' for where a cost item is overstated, as in the case before us, gross income is affected to the same degree as when a gross receipt item of

the same amount is completely omitted from a tax return." [32]

On the other hand, the taxpayer's viewpoint was that the Commissioner's reading fails to take full account of the word "omits", which Congress selected when it could have chosen another verb such as "reduces" or "understates", either of which would have pointed significantly in the Commissioner's direction. Relying on the ordinary and usual definition of the word "omit" the taxpayer contended that the statute was limited to situations in which specific receipts or accruals of income items are left out of the compilation of income items. The Court agreed with the taxpayer's position.

In reviewing the legislative history of the statute the Court concluded that Congress was addressing itself to the specific situation where a taxpayer actually omitted some income receipt or accrual in his gross income, and not more generally to errors in that computation arising from other causes. The Court finally said:

> "We think that in enacting § 275(c) Congress manifested no broader purpose than to give the Commissioner an additional two years to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage in detecting errors. In such instances the return on its face provides no clue to the existence of the omitted item. On the other hand, when, as here, the understatement of a tax arises from an error in reporting an item disclosed on the face of the return the Commissioner is at no such disadvantage." [33]

Thus, in *Colony*, the court made it plain that the clue must appear on the face of the return. The understatement of the tax in *Colony* arose from an error in reporting an item disclosed on the face of the return. In such cases, the court said the Commissioner was not at a special disadvantage in detecting the error.

In *Phinney* the Fifth Circuit in discussing the sufficiency of language used in a return to satisfy the requirements of the statute that the information given on the return should be disclosed in a manner adequate to apprise the Commissioner of the nature of the item, said:

> "We conclude that the enactment of subsection (ii) as a part of section 6501(e) (1) (A) makes it apparent that the six year statute is intended to apply where there is *either a complete omission of an item of income of the requisite amount or misstating of the nature of an item of income which places the 'commissioner * * * at a special disadvantage in detecting errors.'*" (Emphasis supplied) [34]

Thus, the *Phinney* court tells us that the six year statute of limitation applies in either of two situations. One situation is where there is a complete omission of an item from a return, as is the case here. The other is where there is a misstatement on the return of the nature of the item which places the Commissioner at a special disadvantage in detecting the error.

*Benderoff* involved the tax returns of individual taxpayers who held stock in a Subchapter "S" Corporation. The individual returns under the section "other income" showed income from the tax option corporation giving the name of the corporation. The corporation filed a corporate return, for the taxable period, allocating all of the taxable income reported by it to its shareholders. During the taxable year, however, the corporation made a cash distribution to its stockholders of an additional amount which was not reported by it as being taxable to the stockholders. The Commissioner claimed that this cash distribution constituted taxable income to the taxpayers. The taxpayers asserted that the distribu-

---

32. 357 U.S. at 32, 78 S.Ct. at 1036, 2 L. Ed.2d at 1122.

33. 357 U.S. at 36, 78 S.Ct. at 1038, 2 L.Ed.2d at 1124, 1125.

34. 392 F.2d at 685.

tion constituted income upon which taxes had already been paid, but which had not been distributed. A balance sheet was attached to the corporate return, which disclosed information from which the Commissioner could have determined that the taxpayers had omitted the cash distributions from their individual returns. The Commissioner made deficiency assessments, but only after three years from the date of filing of the returns. The question presented was whether or not the Commissioner was given an adequate clue in the balance sheet that there had been a distribution of shareholder's taxable income. If such a clue existed the three rather than the six year statute applied.

In this connection the court said:

"We now arrive at the critical issue which is whether the taxpayers' returns, supplemented by the Form 1120–S return, adequately disclose the distribution of undistributed taxable income.

.   .   .   .   .   .

The proper test thus appears to be whether the return provides a clue as to the omitted item." [35]

.   .   .   .   .   .

"We hold that the returns of the taxpayers, supplemented by the Form 1120–S corporate information return, provides an adequate clue as to the omitted income and that the three-year period of limitations governs." [36]

In *Benderoff* the individual returns provided a clue to the Subchapter "S" Corporation, and the corporate return of the latter provided the clue of the omitted item. Here, the Gift Tax Returns do not contain any clue which would direct an examiner to the Estate Tax Return. *Benderoff* is inapposite.

*Taylor,* supra, involves an individual joint return of taxpayers who held stock in a Subchapter "S" Corporation. Their 1961 return disclosed income derived solely from wages. One of the taxpayers owned twenty-five per cent of the stock in a closely held corporation, which became a Subchapter "S" Corporation on March 1, 1961. During the fiscal year ending February 28, 1962, the corporation derived income of $100,000.00, and that income was reported on its Subchapter "S" information return for the fiscal year ending February 28, 1962. Distributions totalling $18,000.00 were made in March and September, 1961 to one of the taxpayers. Because of the taxpayers' mistaken belief that the distributions were not reportable as gross income in 1961 they made no reference thereto on their return for that year. The Commissioner made a deficiency assessment on such distributions on March 31, 1967, more than three years, but less than six years, after the filing of the return. The question thus presented was whether the period within which the Commissioner might assess a tax deficiency was extended from three to five years because of taxpayers' failure to report or adequately disclose an item of gross income, admittedly taxable in 1961, on their federal income tax return for the year 1961. The court said:

"Thus we must determine whether taxpayers made a disclosure of the omitted income sufficiently adequate to put the Government on notice of the nature and amount of the omission.

As previously stated, taxpayers' 1961 tax return contained no reference to Carolyn Taylor's income from the Subchapter "S" corporation. Furthermore, there was no reference made to the Subchapter "S" corporation in taxpayers' individual return, nor on any schedule contained therein or any statement attached thereto. Under these circumstances, the Government, by examination of taxpayers' individual return, was given no indication of the possible existence, the nature, or the amount of the omitted item nor was it referred to any other source of such information.

.   .   .   .   .   .

---

35. 398 F.2d at 136.

36. Id. at 137.

This Court has long recognized that the extended period of limitations applies when there is no disclosure of an item of income on the face of a tax return. Foster's Estate v. Commissioner of Internal Revenue, 5th Cir. 1942, 131 F.2d 405.

·   ·   ·   ·   ·   ·

Since the Government in this case examined an individual income tax return giving no suggestion or inference that relevant information may have been contained elsewhere, it cannot be seriously contended that the 'adequate disclosure' referred to in section 6501(e) (1) (A) (ii) was made. Therefore, the six-year period of limitations was applicable in this situation." [37]

█ It is clear after a study and analysis of the cases cited by plaintiff that there must be some clue on the face of the return itself or in a statement attached thereto, which is adequate to apprise the Secretary or his delegate (the agent charged with the responsibility of examining the return) of the nature and amount of the omitted item, if the three rather than the six year period of limitation applies. In the case sub judice there is no clue of any nature on either of the returns in question, nor in any statement attached to either one of them. Consequently, the six year period of limitation applied to the returns and the assessments were, in the opinion of the Court, timely made.

### CONCLUSION

There is no genuine issue as to any material fact in the case, and the defendant is entitled to a judgment as a matter of law. Rule 56(c), F.R.Civ.P.

Plaintiff's Motion For A Summary Judgment will be overruled and defendant's Cross-Motion For A Summary Judgment will be sustained.

An appropriate judgment will be entered by the Court.