**Nellie J. LEWIS (formerly Nellie J. Barni)**

v.

**The UNITED STATES.**

**No. 238–70.**

United States Court of Claims.

Oct. 17, 1973.

Arthur Peter, Jr., Washington, D. C., for plaintiff; Stanley Worth, Washington, D. C., attorney of record. A. Faxon Henderson, Jr., Hamel, Park, McCabe & Saunders, and Joseph A. McMenamin, Washington, D. C., of counsel.

Ira Mark Bloom, Washington, D. C., with whom was Acting Asst. Atty. Gen. Fred P. Ugast, for defendant. Gilbert E. Andrews and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This is a gift tax case which comes before us on cross-motions for summary

judgment, with the essential facts undisputed. Plaintiff, now Nellie Lewis, first met her late husband, John J. Barni, Sr., at the end of the 1930's, at a time when he was already separated from his first wife. They became close friends and associates. Starting in 1950, Mr. Barni opened and maintained a stock brokerage margin account in Nellie's name, in order to conceal the account's existence from his then spouse and from a judgment creditor. After his divorce in 1955 and remarriage to the taxpayer later that year, the margin account was transferred into the newly married couple's joint names, as "tenants by the entirety." However, all of the money for the stocks in the account was supplied by Barni, and plaintiff never signed any agreements relating to it. Barni would sign any papers or checks connected with the account for both himself and his wife, and dispose of any proceeds. It is also agreed that Nellie did not participate at all in the administration of the account, and did not know of the various transactions which were all directed by Mr. Barni. Nonetheless, by having the account registered to husband and wife as tenants by the entirety, the Barnis endeavored to continue to protect the funds from the husband's creditors and from attempts by his former wife for increased alimony.

By 1958, after the outstanding judgment had been settled and a final lump sum payment to his first wife had been made, Barni began to consider ways to transfer the account to his name alone.[1] The couple lived in Pennsylvania, and he had been advised that under the law of that state, so long as the joint account existed, he would be unable to make any testamentary distribution of the funds or securities in the account since his wife, as surviving tenant by the entirety, would automatically acquire all of the jointly-owned securities. *See* In re William's Estate, 349 Pa. 568, 37 A.2d 584 (1944). But it turned out that there would be substantial expense in changing the ownership of the account over to Barni's name alone. Under the rules of the stock exchange, it was necessary to pay a transfer tax and a broker's commission when making such a name change, at a cost of some $15,000. Even under an alternative plan of borrowing, paying off the debit balance, opening a new margin account, and then repaying the loan, there would still be, Barni thought, a cost of several thousand dollars and considerable financial risk. Not wishing to incur such expense, Mr. Barni rejected both schemes. Instead, he charged his attorney with the task of finding a cost-less method of allowing the funds and shares in the account to be disposed of by his will.

As a result, a trust agreement, keyed to her husband's then will, was signed by Nellie Barni. A similar trust agreement was executed later, in August 1963, when Barni revised his will for the last time—and that is the version of the agreement involved in this case. In that document, between Nellie Barni as grantor and herself and the family attorney as trustees, Mrs. Barni expressly recognized that the margin account was listed in the names of both husband and wife as tenants by the entirety, and declared that the joint listing was solely for legal expediency. The document states that she realized that, if the securities were still listed in that manner at the time of her husband's death, she would probably gain sole possession as surviving joint owner; she also said that she wished to facilitate distribution of the account funds according to the terms of her husband's will, but recognized that there would be substantial fees for transfer to his name alone. In order to save him the expense of such a transfer, she "irrevocably" assigned all of her rights in the securities, to be listed at her husband's death, to the trust-

---

[1]. Not all incentives for continuation of the tenancy by the entirety had been removed. One reason for setting up the accounts as they were was to minimize the possibility and effect of attacks on Barni's will by the children of his first marriage—and that interest continued. See also note 5, *infra.*

ees in trust for the purposes and provisions listed in his then will. The trustees were not given discretionary power. They were to administer the trust property exactly as provided in the will.

Barni died a few months later, in December 1963, and, in accordance with the trust agreement, the securities were distributed in the manner specified in his August 1963 will. Half of the money went to a trust exclusively for support of the plaintiff widow while the other half was held in trust for the benefit of the children of the first marriage and of other relatives.

Plaintiff filed a gift tax return describing her trust agreement but reported no gift tax liability. The Internal Revenue Service determined that there was a gift by her at the moment of her husband's death—because property then passed at her direction out of her ownership and control—and assessed a gift tax of $123,979, plus interest of $30,101.42.

In this action plaintiff seeks refund of the assessed tax and interest (together with statutory interest). She makes two main contentions. The first is that there never was a tenancy by the entirety, that Mr. Barni always retained the full and complete ownership of the entire account and nothing ever came to or passed from her. The second argument is that, even if a tenancy by the entirety did once exist, it ceased to be with the execution of the trust agreement in August 1963. We reject both points, and hold that a gift tax was properly levied in at least the amount collected.

### I.

By the specific wording of the margin account agreement, John and Nellie Barni held ownership of the account as tenants by the entirety, a form of title that Pennsylvania has recognized since at least early in the 19th century. *See* Fairchild v. Chastelleux, 1 Pa. (Barr) 176, 44 Am.Dec. 117 (1845); Beihl v. Martin, 236 Pa. 519, 84 A. 953 (1912). This status has certain well-de-

fined characteristics. As described in Lang v. Commissioner, 289 U.S. 109, 111, 53 S.Ct. 534, 535, 77 L.Ed. 1066 (1933):

[a]n estate by the entirety is held by the husband and wife in single ownership, by a single title. They do not take by moieties, but both and each take the whole estate, that is to say, the entirety. The tenancy results from the common-law principle of marital unity; and is said to be *sui generis*. Upon the death of one of the tenants "the survivor does not take as a new acquisition, but under the original limitation, his estate being simply freed from participation by the other * * *."

(Beihl v. Martin, *supra*, a leading Pennsylvania case, is to the same effect.) Because the survivor merely continues to possess and own what he or she already had, *see* Beihl v. Martin, *supra*, 236 Pa. at 522–523, 84 A. at 954, an entirety estate is unaffected by provisions of the will of the first spouse tô die. The property passes automatically outside of the will, and efforts to dispose of such property under the will or attacks upon the will relating to those assets are of no avail. Similarly, property held by the entirety is immune from the reach of a third party creditor of one spouse only. Madden v. Gosztonyi Savings & Trust Co., 331 Pa. 476, 482, 200 A. 624, 627–628 (1938).

With respect to securities, the purchase of stock by one spouse in the name of both leads to a presumption of the creation of an estate by the entireties. "The placing of the property in both names, without more, creates an estate by the entireties"; in order to show otherwise, one must produce clear and convincing evidence. In re Holmes' Estate, 414 Pa. 403, 406, 200 A.2d 745, 747 (1964); *see* Nachman v. Nachman, 417 Pa. 389, 395–396, 208 A.2d 247, 251 (1965). It is not enough to overcome the presumption that all of the funds originate with only one spouse, or that the other spouse does not know or consent to the creation of the estate, or that

all certificates are delivered to and held by the creator-spouse. In re Holmes' Estate, *supra*, 414 Pa. at 406–407, 200 A.2d at 747. Nor is an agreement between husband and wife necessary. Nachman v. Nachman, *supra*, 417 Pa. at 393, 208 A.2d at 250; Geist v. Robinson, 332 Pa. 44, 47, 1 A.2d 153, 155 (1938).

Clearly, the Barnis' margin account, expressly designated in both names as tenants by the entirety, met the requirements for presuming such a valid tenancy.[2] As we have just indicated, it is irrelevant that Mr. Barni supplied all the money or kept custody and control of the papers. Nor was the existence of a valid tenancy by the entirety undermined by the failure of Mrs. Barni to participate in the management of the account. Although completely passive, she still had the capability of control and that power did not atrophy because of the lack of exercise. *See* Geist v. Robinson, *supra*, 332 Pa. at 47, 1 A.2d at 155; Bostrom v. National Bank of McKeesport, 330 Pa. 65, 67–68, 198 A. 644, 646 (1938). Either spouse "presumptively has the power to act for both, so long as the marriage subsists, in matters of entireties, without any specific authorization, provided the fruits or proceeds of such action inures to the benefit of both and the estate is not terminated." Madden v. Gosztonyi Savings & Trust Co., *supra*, 331 Pa. at 489, 200 A. at 630–631; *see* Kennedy v. Erkman, 389 Pa. 651, 658, 133 A.2d 550, 553 (1957).

The taxpayer stresses the rebuttability of the presumption—urging that a contrary intent of the parties will work such a refutation, and relying upon Uccellini v. Ucellini, 423 Pa. 273, 223 A.2d 694 (1966). In that case, the married couple agreed that both would contribute funds to the account.[3] Because the intended mutual performance did not occur (the wife failed to make her contribution), the court held that no entireties estate was ever created. *Uccellini* was later limited by the Supreme Court of Pennsylvania to that particular factual situation—where husband and wife make a stipulation of mutual contribution and the wife fails to perform her part of the bargain. Specifically, the Pennsylvania court rejected any contention that "*Uccellini* holds that the inclusion of the wife's name on * * * document[s] * * * is not sufficient, but that a distinct transaction is required to create a tenancy by the entireties." In re Estate of Carnevalino, 435 Pa. 366, 369, 257 A.2d 546, 547–548 (1969). Without evidence of the type of added requirement present in *Uccellini*, the accepted rule applies that there is a presumption of the creation of a tenancy by the entirety from the mere insertion of the inactive spouse's name. 435 Pa. at 369, 257 A.2d at 548. *See* Cohen v. Goldberg, 431 Pa. 192, 195, n. 1, 244 A. 2d 763, 765, n. 1 (1968). Put more generally, the Pennsylvania cases strongly imply that the presumption should not be overturned lightly.[4]

2. The stocks in the margin account were actually registered in the "street" name of the brokerage house (as was the practice of that firm for all margin accounts) but, in view of the express provisions of the account agreement and the way it was designated, it is not contended, and properly so, that the formal registration of the securities made any difference for the purposes of this case.

3. The form or manner of creation of tenancies by the entirety can be tailored or conditioned by the parties to fit their particular objectives. *See, e. g.*, United States v. 246 Acres of Land, 78 F.Supp. 377, 379 (W.D.Pa., 1948).

4. Taxpayer also cites the federal estate tax decision of Estate of Chrysler v. Commissioner, 361 F.2d 508 (C.A.2, 1966), as authority for looking through the veil of joint tenancies. In *Chrysler*, the court found that, in special circumstances, the joint tenancies were simply devices for making gifts to minor children and avoiding cumbersome alternative mechanisms. But the court also noted that, where minor children were not involved, there was no reason to suppose that a joint tenancy interest was nominal rather than beneficial. 361 F.2d at 510.

We do not think the presumption has been overcome in this case. There is no indication that the creation of an entirety tenancy was dependent upon some pre-condition, as in *Uccellini*. It is indisputable, moreover, that when the margin account was first put, in 1955, in the names of Mr. and Mrs. Barni as tenants by the entirety that form of estate was deliberately used to thwart significant third-party claims to the funds and securities. Although the need for the entirety kind of ownership diminished in 1958, it did not disappear entirely (see note 1, *supra*),[5] and Mr. Barni refused, because of the expense, to take the steps which would have effectively severed the joint interests. The trust agreement executed in August 1963 makes it clear that plaintiff considered the margin account to be then held by the entirety. The document recognizes, first, that the "said corporate stocks, shares and securities are held in said Margin Accounts in the names of John J. Barni, Sr. and Nellie J. Barni, his wife, as tenants by the entirety, or otherwise in their joint names"; second, the plaintiff "has been advised and understands that if her husband, John J. Barni, Sr., should die while the said corporate stocks, shares and securities are still listed and held in said brokerage margin accounts in the joint names of John J. Barni, Sr. and Nellie J. Barni, that she would probably, upon the death of her husband, become the sole owner of the said corporate stocks and securities as the surviving joint owner"; and, third, that a transfer into Mr. Barni's sole name "will cost a substantial sum of money in brokerage fees, taxes, and transfer fees."[6]

These statements are wholly inconsistent with the view, now pressed, that no tenancy by the entirety was ever created. The fact that the husband supplied all the money and wholly controlled the account, that plaintiff played no role in its management, and that the couple wished the husband to have full power of control and to be able to treat the account as his own,[7] are not enough—under the Pennsylvania authorities—to refute the potent presumption flowing from the formal creation, continuation, and acknowledgment by both spouses of the existence of the estate.

## II.

Plaintiff next asserts that, in any event, the trust agreement of August 1963 effectively terminated any tenancy by the entirety that may have previously existed, passing the property out of her ownership at that moment.

In general under Pennsylvania law, once a tenancy is established,

5. An entirety estate has the general advantages, furthermore, of freeing the assets held in that form from probate proceedings and of immunizing them from the reach of creditors (*e. g.*, the Federal Government) of one of the spouses.

6. There is language in the trust agreement declaring that Barni had the power, by himself, to transfer the funds to his sole possession at any time. Since, as we hold, there was in fact a valid tenancy by the entirety, this unqualified statement was erroneous, as literally phrased. It could only be proper if treated, together with the rest of the trust agreement, as a declaration of acquiescence by Mrs. Barni in such potential action by her husband in the future.

7. It is not at all plain that Mrs. Barni desired her husband to have the unlimited power of disposition she now asserts. In the trust agreement of August 1963 she relinquished "all of her right to said property [the securities], except insofar as she is provided for out of said property as a beneficiary" under the "said" will. While these words are not completely clear, one can easily infer that, since Mr. Barni had on previous occasions rewritten his will, this particular agreement was tied to the August 1963 will. There were previous "irrevocable" trust agreements (keyed to earlier wills) and they were superseded by successors and by this August 1963 agreement. Mr. Barni was, of course, free to rewrite his will after August 1963, and such a rewriting might call for a new trust agreement harmonizing with the new will. Additionally, the "except insofar" clause is susceptible to interpretation as a protective restriction upon the assignment. If Mr. Barni in a later will chose to reduce substantially the provisions for his wife, Mrs. Barni may have retained the right to call off the assignment.

neither spouse can partition, terminate or sever the estate by his or her action alone—at least not to the detriment of the other. One cannot affect, by individual conduct, the partner's survivorship rights. *See* In re Holmes' Estate, *supra*, 414 Pa. at 407, 200 A.2d at 748. As long as they continue to be husband and wife, neither can alienate a portion of the tenancy for his or her individual benefit without the other's consent. Spinelli v. Spinelli, 264 F.Supp. 107, 109 (E.D.Pa., 1967). The only justifiable appropriations are those made in good faith for the mutual benefit of both. Shapiro v. Shapiro, 424 Pa. 120, 136, 224 A.2d 164, 172 (1966). At the same time, the estate can be ended at any point by mutual agreement, In re Smulyan, 98 F.Supp. 618, 621 (M.D.Pa., 1951); *see* In re Estate of Brose, 416 Pa. 386, 391, 393, 206 A.2d 301, 304, 305 (1965), but there must be consent or knowledge on the part of both. *See* In re Gallagher's Estate, 352 Pa. 476, 478–479, 43 A.2d 132, 133 (1945). Presumably, one spouse can also, during the lifetime of the other, renounce outright his interest in the tenancy, releasing all rights to the other; such a renunciation causes a severance that would not normally be to the recipient partner's detriment. *See*, C. J. Moynihan, Introduction to the Law of Real Property 233 (1962).

■ The agreement of 1963 did not produce a termination of the estate. It is doubtful that Mrs. Barni wished to cut off all her own interests in the tenancy since she carefully preserved her rights as a beneficiary under her husband's then will, and as we have pointed out, note 7, *supra*, this may well have meant that she continued to hold a string to the assets in the margin account. But even if she did have this wish, she failed to accomplish a sever-

ance. There was no direct and complete renunciation, but instead she assigned any rights to securities "which will or would pass to her sole name as the surviving joint owner, upon the death of her husband," to the trustees for the purpose of following the provisions of his will. The list of specific stocks involved was to be drawn up at the time of his death; the agreement provided that a "list of the said corporate stocks, shares and securities [in the margin account] shall be made at the time of passing which shall be called Schedule A and which shall be attached to and made a part of this Trust Agreement."

At the very most, this was an effort to provide for the potential or possible transfer of certain securities to be identified and determined in the future—not a present renunciation of property rights. Since the contents of the account were fluid and changed with Mr. Barni's various transactions, the particular securities involved would not and could not be known until his death; moreover, there might never be any transfer at all since plaintiff could die before her husband, in which event the trust agreement would be wholly inoperative. Another possibility was that Mr. Barni might change his will, thus opening up the prickly issue of the standing of the trust agreement in that situation.[8] *Cf.* Fairclaw v. Forrest, 76 U.S.App.D.C. 197, 130 F.2d 829, 834 (1942), cert. denied, 318 U.S. 756, 63 S. Ct. 531, 87 L.Ed. 1130 (1943). In addition, although the terms of the trusts paralleled the directions of the then will, the agreement did not purport to transfer the property to Mr. Barni, the other spouse—which is what would ordinarily be done in the case of a true renunciation —but to the trustees, and then only for rigidly restricted purposes tied to a particular will.

---

8. In that event, or perhaps even in other circumstances, Mrs. Barni might seek to revoke the trust agreement. That document declares the assignment to be "irrevocable", but similar agreements, also said to be "irrevocable", had been executed by her prior to 1963 but had

nevertheless been superseded by successor agreements, including the 1963 paper. There are also indications on the face of the agreement that it was not intended to be truly "irrevocable." See note 7, *supra*.

The Barnis were fully aware in August 1963 of the consequences vis-a-vis his death and his will of leaving the account in both names. They could have agreed to dissolve the account but refrained, primarily because of the expense.[9] They substituted the device of this trust agreement which they considered would achieve compliance with the terms of the then will without formally ending the entirety estate or incurring transfer costs. The necessary result of this considered choice was that the tenancy continued until Mr. Barni's death some five months later. As so often, the end of the journey inevitably followed upon the road the participants picked to travel.[10]

### III.

On this premise, there is no doubt that a gift tax was owing. The Internal Revenue Code imposes such a levy on individuals upon "the transfer of property by gift" (§ 2501 (a)), "whether the transfer is in trust or otherwise, whether the gift is direct or indirect, and whether the property is real or personal, tangible or intangible * * *" (§ 2511(a)). Here, upon her husband's death, plaintiff transferred (via the provisions of the trust agreement) her ownership of the margin account to one or both of the trusts created under the will.[11]

Comparable gift tax decisions are Krakoff v. United States, 313 F.Supp. 1089 (S.D.Ohio, 1970), aff'd, 439 F.2d 1023 (C.A. 6, 1971), and Bishop v. United States, 338 F.Supp. 1336 (N.D.Miss., 1970), aff'd per curiam, 468 F.2d 950 (C.A. 5, 1972). In both cases a married couple held property as joint tenants with right of survivorship, and in each the survivor tried to renounce his or her interest after the death of the other marital partner, so that the property could pass to others. In both, the courts held the renunciations ineffective as such, but operative to transfer the assets to the third-party recipients—and thus to trigger the gift tax. So long as the survivor was aware of the status of the property before the death of the spouse, no effective severance or renunciation could occur unless done before death. As said by the district court in *Bishop,* "[t]he execution of the disclaimers by [the survivor] amounted to nothing more than a transfer of property owned absolutely by him, and constituted * * * a transfer of property by gift * * *." 338 F.Supp. at 1348–1349.

Taxpayer complains that, since the full amount of the margin accounts had already been subjected to the estate tax on Mr. Barni's estate, the imposition of gift tax liability on the widow amounts to "double taxation." A similar claim was rightly rejected in Krakoff v. United States, *supra,* 439 F. 2d 1023, 1027–1028 (C.A. 6, 1971). As the Government points out, it is not uncommon for recipients of funds by inheritance or survivorship to make gifts

---

9. As mentioned in note 1, *supra,* they also knew that continuation of the tenancy would protect the funds from attack by the children of Mr. Barni's first marriage. *See,* too, note 5, *supra.*

10. Plaintiff points out that the brokerage firm, on Mr. Barni's death, treated the securities as passing to his estate; the account was then liquidated and the cash divided among the trusts set up under the will. The issue was not actually litigated in the probate proceedings. This practice by the brokerage house, and the passive acquiescence by the probate court, cannot alter the legal effect of the trust agreement of August 1963, as we have found it to be. *Cf.* Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

11. In assessing the gift tax the Internal Revenue Service assumed that taxpayer's gift in December 1963 was to her husband (and therefore subject to the marital deduction) while the Government, before us, now asserts that the gift was rather to the trust for her husband's children (and outside the marital deduction). The Government concedes, however, that, in any event, the taxpayer's liability is limited by the lower assessment made by the Service. Though the defendant's present position seems correct, we need not resolve the issue definitively since plaintiff is not entitled to recover on either view.

out of those funds, and such transfers are subject to the gift tax irrespective of any prior estate (or other) taxes levied against those funds. If, for instance, Mr. Barni, owning all the account funds at the time of his death, had left them to plaintiff, and she had then turned a portion over to his children, she would clearly have been liable for a gift tax even though his estate would have paid a tax on the whole amount. In the actual case, as in this hypothetical, the imposition of the two taxes comes about because of the way the couple chose to arrange their affairs.[12]

For these reasons, the plaintiff is not entitled to recover. The defendant's motion for summary judgment is granted and the plaintiff's motion is denied. The petition is dismissed.

12. Plaintiff mistakenly seeks support from Rev.Rul. 69–148, 1969–1 Cum.Bull. 226, which concerns the gift tax liability of persons funding joint accounts—the holding is that the creator and sole contributor of a joint brokerage account with securities registered in the name of a nominee of the firm has not made a gift to the other joint owner unless and until the joint owner draws on the account for his benefit. This ruling would apply only to the gift tax liability of John Barni in creating the brokerage account and does not aid us at all in deciding the question of Mrs. Barni's liability. Her gift-tax responsibility arises from her transfer of the property, after receiving sole possession as survivor.