SECURITIES & EXCHANGE COMMISSION, Plaintiff,

v.

G. WEEKS SECURITIES, INC.;  G. Weeks & Co., Inc.;  Robert Bruce, C. M. Hodge, John Kilpatrick, Patrick Michael, Robert Quarles, Carlos Smith, Randy Vallen, William Shelton and A. V. McDowell, Defendants.

No. 79–2711.

United States District Court, W. D. Tennessee, W. D.

Jan. 30, 1980.

Joseph L. Grant, James E. Long, Steven J. Gard, Securities and Exchange Commission, Atlanta, Ga., for plaintiff.

Robert L. Kassel, Anthony V. Labozzetta, New York City, for defendants.

A. V. McDowell, McDowell, Sayle & Sayle, Memphis, Tenn., Bruce S. Kramer, Rosenfield, Borod & Kremer, Memphis, Tenn., for Investors' Committee.

Shepherd D. Tate and John D. Martin, Jr., Martin, Tate, Morrow & Marston, Memphis, Tenn., for Blue Cross-Blue Shield of Fla.

Marion S. Boyd and Charles W. Burson, Wildman, Harrold, Allen, Dixon & McDonnell, Memphis, Tenn., for Union Federal Sav. & Loan Ass'n.

Davis S. Kennedy, Memphis, Tenn., for G. Weeks Securities, Inc.—bankrupt.

WELLFORD, District Judge.

## ORDER

In this action by the SEC to enjoin defendants from engaging in various, alleged securities laws violations, several motions are presently pending before the Court. Defendants have filed a motion to dismiss the action based on an asserted absence of SEC jurisdiction over the transactions in dispute and have filed a motion to compel the joinder of the Commodity Futures Trading Commission, which, according to defendants, has exclusive jurisdiction over the transactions.

Defendants have additionally filed motions to adjourn and/or stay proceedings in this Court pending appeal of the preliminary injunction against antifraud violations presently in effect as to some defendants and also pending anticipated resolution by the Supreme Court of an issue which defendants maintain is crucial to proper determination of this case.

Also pending are plaintiff's motions to extend the preliminary injunction to all remaining defendants and to extend the scope of the injunction to encompass alleged violations of the registration provisions of the Securities Act.

## I. BACKGROUND

The SEC filed the complaint in this case on October 26, 1979, seeking a temporary restraining order, preliminary injunction, and permanent injunction based on alleged violations of the antifraud and registration provisions of the securities laws. Specifically, the Commission charged defendants with violating Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, as amended, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and also Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78j(b), and accompanying Commission Rule 10(b)–5, 17 C.F.R. 240.10b–5. The SEC additionally alleged that defendant G. Weeks Securities, Inc. (GWS) was insolvent and required the appointment of a receiver.[1]

1. GWS subsequently filed a voluntary petition under Chapter XI of the Bankruptcy Reform Act on November 6, 1979; there is little doubt about its insolvency. In view of an attempted rehabilitation and also in view of a stipulation and agreement entered between GWS and a committee representing a substantial majority of GWS' creditors containing numerous financial safeguards and other protective measures, the Court has thus far declined to order the appointment of a receiver. *See* Court's Orders

G. Weeks Securities, Inc. is a Delaware corporation and is registered as a dealer in government securities with the State of Tennessee. Defendant G. Weeks & Co., Inc. is also a Delaware corporation and is registered as a broker-dealer under Section 15(b) of the Exchange Act, 15 U.S.C. § 78o (b). The principal offices of both corporations are in Memphis, Tennessee.

Defendant Gerald Dean Weeks is the chief executive officer and controlling shareholder of both corporations. The remaining defendants are employees or former employees of the corporations.

The SEC's charges in this case stem from defendants' participation in an investment transaction known as a "standby with pair-off". This arrangement essentially involved an agreement between GWS and its customers simultaneously to buy and sell certain certificates guaranteed by the Government National Mortgage Association (GNMA) at a future date at specified prices. The price to be paid by GWS was higher than that to be paid by the customer, and GWS additionally agreed to forego its right to purchase from the customer if the market price of the GNMA bonds at the specified future date was higher than the price GWS was to pay. In return, the customer paid a "commitment" fee to GWS.

The SEC asserts that the "standby with pair-off" arrangement is either an investment contract or an unsecured evidence of indebtedness and thus a security within the meaning of the federal securities acts. Although consistently disputing this assertion, defendants have taken varying positions as to the exact nature of the transaction. In their initial and supplemental memoranda of law filed October 31, 1979, and November 6, 1979, defendants maintained that they were engaged in bona fide purchases and sales of bonds guaranteed by the

government and were thus exempt from the securities law. *See* 15 U.S.C. §§ 77c(a)(2) and 77o(a). In their motion to dismiss of December 12, 1979, defendants argued that GWS is a dealer in GNMA futures contracts, which, according to defendants, are under the exclusive regulatory jurisdiction of the Commodity Futures Trading Commission.[2]

On December 5, 1979, the Court made certain findings of fact and conclusions of law and issued a preliminary injunction against GWS, G. Weeks & Co., Inc., Gerald Dean Weeks, and certain other individual defendants, prohibiting further violations of the antifraud provisions of the securities acts.

## II. MOTION TO DISMISS BASED ON LACK OF SEC JURISDICTION

Defendants have mounted a multi-pronged attack on jurisdiction in this case, arguing (1) that they have engaged in the actual purchase and sale of GNMA bonds and are thus exempt from the registration provisions of the securities laws, (2) that the "standby with pair-off" transaction does not represent a "security" apart from the transactions in GNMA bonds, and (3) that the "standby with pair-off" is a commodities futures contract within the exclusive regulation of the Commodity Futures Trading Commission (CFTC).

Registration requirements of the Securities Act do not apply to the sale of government guaranteed securities. 15 U.S.C. § 77c(a)(2). Equally clearly, there is no such exemption from the antifraud provisions. 15 U.S.C. § 77q(c). There is substantial dispute, however, over the precise jurisdictional powers of the SEC and the CFTC with respect to transactions that may arguably be characterized as both securities and commodities.[3]

---

of November 7, 1979, November 13, 1979, and November 30, 1979.

2. In a suit by GWS against a private defendant in the Southern District of New York, GWS has apparently asserted that the "standby with pair-off" transactions are securities under the antifraud provisions of the Securities Act and

has not attempted to characterize them as commodities futures. *See* plaintiff's Exhibit No. 22.

3. *See* Guttman, The Futures Trading Act of 1978: The Reaffirmation of CFTC–SEC Coordinated Jurisdiction Over Security/Commodities, 28 Am.U.L.Rev. 1 (1978); Russo & Lyon, The Exclusive Jurisdiction of the Commodity Fu-

A theoretical example of a "standby with pair-off" is best described in steps:[4]

a) GWS agrees to sell a GNMA bond to customer A for settlement in 120 days at a price of $95. The current market price is $95.

b) Simultaneously, customer A agrees to sell to GWS a GNMA bond on a standby basis for settlement in 120 days at a price of $101. "Standby basis" means that the customer need not sell to defendant, but may sell to outside investors if the price of the bond rises above $101.

c) Customer A pays a commitment fee of $5.15 to GWS.

d) If, in 120 days, the price of the bond is below $101, customer A will elect to deliver the bond to GWS. Because both parties have a simultaneous obligation to buy and sell, no actual exchange takes place. GWS makes a $6 payment to customer A, which represents a return of the commitment fee, plus stated interest.

e) If the market price in 120 days is higher than $101, customer A may purchase the bond from defendant and sell it on the open market.

f) The funds advanced by customers are deposited with GWS and used for investment purposes. Subsequent to receipt of the funds, GWS sends a letter of acknowledgement to the customer guaranteeing repayment.

In actuality, GWS never delivered any GNMA bonds to any customers. In addition, the funds forwarded by customers were neither segregated nor secured, despite alleged representations to the contrary by GWS salesmen to customers. *See* Findings of Fact and Conclusions of Law, December 5, 1979.

A. *Standby with Pair-off as a Security*

Both the Securities Act and the Securities Exchange Act include within the definition of a security any "note . . . evidence of indebtedness . . . [or] investment

contract . . . " 15 U.S.C. § 77b(1), § 78c(a)(10). Although containing slight variations, the definitions under the two Acts have been held to be virtually identical. *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

▮ The securities acts and their various provisions are to be construed in light of the underlying legislative policy. *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 350–51, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943). This Congressional purpose has been recently interpreted by the Supreme Court:

> The primary purpose of the Securities Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interests of investors.

*United Housing Foundation v. Forman*, 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975). In addition, the courts have repeatedly stated that whether a "security" exists depends not upon the name or characterization given a particular transaction, but upon the underlying economic substance or reality. *Forman, supra*, at 849, 95 S.Ct. at 2059, *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252, 1256 (9th Cir. 1976).

As indicated previously, the Commission maintains that the "standby with pair-off" constitutes an investment contract and/or an evidence of indebtedness.

(i) *Investment Contract*

In *SEC v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1945), the Supreme Court enunciated its now familiar definition of an investment contract:

> The test is whether the scheme involves an investment of money in a common

---

tures Trading Commission, 6 Hofstra L.Rev. 56 (1977).

4. *See* the affidavit of defendant John Kilpatrick, filed October 31, 1979.

enterprise with profits to come solely from the efforts of others.

*Id.* at 301, 66 S.Ct. at 1104.

Viewed in its entirety, the "standby with pair-off" transaction fits within the *Howey* standard. Numerous customers transferred their "commitment" fees to GWS, which commingled the funds and invested them. Although it was theoretically possible for customers to profit by selling GNMA bonds received from GWS on the open market, the substantial likelihood (and in actuality, the exclusive occurrence) was that no bonds would ever be transferred. Investors would receive profits, in the form of a stated return on the commitment fee, but only if GWS was successful in investing their funds. In light of the "guaranteed" interest aspect of the transaction and the practical reality that no bonds were in fact transferred, defendants' assertion that the success or failure of the standby with pair-off transactions in issue was exclusively dependent upon the external forces of the market place is untenable and unrealistic.

### (ii) *Evidence of Indebtedness*

"Evidence of indebtedness" has been defined as a "contractual obligation to pay in the future for consideration presently received." *United States v. Austin,* 462 F.2d 724, 736 (10th Cir.), *cert. denied,* 409 U.S. 1048, 93 S.Ct. 518, 34 L.Ed.2d 501 (1972). In determining whether a particular transaction constitutes an evidence of indebtedness or note within the contemplation of the securities laws, the courts have adopted numerous approaches. Some generally follow an investment-commercial test premised on the view that Congress was concerned only with undesirable practices associated with investment transactions. Under this approach, those notes sold in connection with commercial transactions are not deemed to be securities. *See McGovern Plaza Joint Venture v. First of Denver,* 562 F.2d 645 (10th Cir. 1977); *C.N.S. Enterprises, Inc. v. G. & G. Enter-*

*prises, Inc.,* 508 F.2d 1354 (7th Cir. 1975), *cert. denied,* 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975); *McClure v. First National Bank of Lubbock,* 497 F.2d 490 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir. 1973).

The Ninth Circuit utilizes a risk capital test in which the crucial inquiry is whether the investor contributes risk capital subject to the entrepreneurial or managerial efforts of others. *See AMFAC Mortgage Corp. v. Arizona Mall of Tempe,* 583 F.2d 426 (9th Cir. 1978). This approach overlaps with the *Howey* test and investment contract scrutiny.[5]

The Second Circuit advocates a literal approach under which the party seeking to avoid the imposition of the securities laws has a more substantial burden in demonstrating that a note is not a security. *Exchange National Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126 (2d Cir. 1976).

The results reached through application of these various tests, however, are generally consistent. *See AMFAC Mortgage Corp. v. Arizona Mall of Tempe, supra* at 431. Measured by any of these standards, the "standby with pair-off" transactions in this case must be deemed to be securities. GWS customers provided funds in exchange for a guaranteed return on their investments. Although a theoretical possibility of additional gain from market fluctuation existed, the market presented no *risk* whatsoever to the customer. The only risk lay (and it turned out to be a substantial one) in the potential inability of GWS to perform under the agreement; that is, to satisfy its evidence of indebtedness. This indebtedness was unsecured, moreover, and could only be satisfied if GWS' investment efforts were successful.

As evidenced by GWS' current status as a debtor in bankruptcy, the "standby with pair-off" presents a classic investment situation in which investors are in need of financial information that securities issuers

---

5. A significant factor noted as to whether or not an instrument or loan agreement is a "security" is whether or not there is collateral. Lack of collateral, as here, is an indication that the arrangement might be a security under the law. 583 F.2d 433.

must provide under the registration provisions of the Securities Act. The express purpose underlying these provisions is to enable investors to reach an informed judgment concerning the merits of an investment. *Gilligan, Will & Co. v. Securities and Exchange Commission*, 267 F.2d 461 (2d Cir. 1959), citing *A. C. Frost v. Coeur D'Alene Mines Corp.*, 312 U.S. 38, 40, 61 S.Ct. 414, 415, 85 L.Ed. 500 (1941). The customers of GWS were unable to make such an informed decision.[6]

### B. Standby With Pair-off as a Futures Contract

Under the Commodity Futures Trading Commission Act (CFTCA), the Commodity Futures Trading Commission has "exclusive jurisdiction" over transactions involving contracts of sale for future delivery of government securities conducted on a designated contract market or board of trade. 7 U.S.C. § 2. Pursuant to its statutory authority under 7 U.S.C. § 7, the CFTC has designated the Chicago Board of Trade as a contract market for trading in futures on GNMA certificates. *See* Commodity Futures Trading Commission Release No. 48–75 (Sept. 11, 1975).

Whether exclusive CFTC jurisdiction exists over transactions (like those at issue) not conducted on designated contract markets remains a substantially unsettled question. *See* note 3 *supra*. This question need not be confronted, however, in the instant case. The Court's findings compel a conclusion that the "standby with pair-off" is not a commodities futures contract. Any question concerning exclusive CFTC jurisdiction is therefore obviated.

In a genuine futures contract, an agreement obligating the investor to purchase certain commodities at a future date, or a

futures option, an agreement by which the purchaser buys the right to buy or sell a futures contract before a future date, profitability depends on market fluctuation, not upon the entrepreneurial activities of the seller. *SEC v. Commodity Options International, Inc.*, 553 F.2d 628, 630 (9th Cir. 1977); Jones & Cook, The Commodity Futures Trading Commission Act of 1974, 5 Mem.St.U.L.Rev. 457, 460 (1975). For this reason, some courts have held commodity futures or options not to be securities. *See Glazer v. National Comm. Research & Statistical Serv., Inc.*, 338 F.Supp. 1341 (N.D. Ill.1974), aff'd., 547 F.2d 392 (7th Cir. 1977).

The "standby with pair-off" is similar, however, to the naked double options of the type at issue in *Commodity Options, supra*.[7] In that case, as here, the futures characteristics, if any, are mere facade. GWS did not maintain adequate inventories for GNMA certificates or futures contracts and there appears to have been no intent whatever that actual certificates would be traded. The investor did not acquire an interest in an underlying futures contract or option, but rather obtained a return on his commitment fee, if GWS performed. The customer's risk, as indicated above, was not based on market conditions related to any commodity, but was instead based on GWS' success or failure in investing his funds. This risk is identical to that associated with traditional securities and an "economic realism" approach requires the finding of a security.

■ Even viewed as two separate contracts for future delivery of GNMA bonds, the "standby with pair-off" arrangement would not constitute a futures contract within exclusive CFTC jurisdiction. The transactions here would be similar to the contracts for future delivery in *Bache Hal-*

---

**6.** It should be noted that the National Credit Union Administration has concluded that transactions virtually identical to those in this case are "unsecured loans to a broker." 44 Fed. Reg. 51198.

In addition, defendants' attempt to rely on the finding of no security in *Bache Halsey Stuart v. Affiliated Mortgage Investments, Inc.*, 445 F.Supp. 644 (N.D.Ga.1977) is not well-

founded. The transaction in *Bache* involved neither a guaranteed return nor any payment by the investor until the date of delivery.

**7.** Defendants' assertion that the court in *Commodity Options* acknowledged that the CFTC would have had exclusive jurisdiction after the effective date of the CFTCA is inaccurate. The court simply stated that that question was not before it. 553 F.2d at 629, n.2.

78

*sey Stuart v. Affiliated Mortgage Investments, Inc.,* 445 F.Supp. 644 (N.D.Ga.1977), in which the court rejected exclusive CFTC jurisdiction for reasons that would also apply:

> The Court notes first that the transactions in question must be distinguished from sales of GNMA futures contracts which are presently being traded on the Chicago Board of Trade. The Board of Trade transactions are highly standardized; the futures contracts are sold at auction, with the only open term in the transaction being the price. Delivery is very rarely taken in such transactions. In the forward contracts under consideration, the parties negotiate all the terms of the sale, including the interest rate, date of delivery, and price, and the purchaser most often takes actual delivery of the underlying certificate.[8] Transactions involving futures contracts require the participation of a clearing house which buys from the seller and sells to the buyer; forward contracts, or contracts for delayed delivery, are negotiated directly between the buyer and seller, and no third party is ever involved. Futures contract trading may be carried on through a discretionary account managed by a broker-dealer; the forward contracts involved here require party-to-party negotiation. The current dispute between the SEC and the Commodities [sic] Futures Trading Commission (CFTC) concerns jurisdiction over futures contracts trading and possible registration and does not bear on the issue presently before the Court.

*Id.* at 646.

■ Finally, even if the "standby with pair-off" were deemed to constitute a commodity futures contract, exclusive CFTC jurisdiction would nevertheless be absent. CFTC jurisdiction is exclusive only as to futures transactions conducted "on a contract market designated pursuant to section [5] . . . or any other board of trade." 7 U.S.C. § 2. It is undisputed that the transactions here were not conducted on a designated contract market. And defendants' inventive attempt to characterize the GNMA Mortgage-Backed Securities Dealers Association as a "board of trade" must be rejected.

GWS is not a member of the association in question, nor is it clear that the association is in fact a board of trade.[9] In addition, there is substantial doubt whether CFTC exclusive jurisdiction exists beyond transactions conducted on designated contract markets.[10] In the absence of clearly exclusive CFTC jurisdiction, denial of SEC jurisdiction in a case in which the CFTC has expressly chosen not to act[11] would be contrary to expressed Congressional intent in adopting and defining CFTC jurisdiction.[12] This is particularly true when a broker-dealer that has not complied with the regulatory provisions of the CFTCA seeks to interpose exclusive CFTC jurisdiction as a defense in an action brought by the SEC. Indeed, this practice has not been condoned by the CFTC:

> Notwithstanding the broad significance of the "exclusive jurisdiction" provision . . . we do not believe that a person who, in violation of the Commodity Exchange Act, has failed to submit to the exclusive jurisdiction of the Commission by seeking or obtaining designation or

---

**8.** This factor is obviously inapplicable in the instant case.

**9.** CFTC's interpretive letter stated that the association *might be* a board of trade despite intentions to the contrary. Interpretive Letter No. 100.77–12, Comm.Fut.L.Rep. (CCH) ¶ 20,-467 (August 17, 1979). This statement hardly represents an attempted assertion of exclusive jurisdiction.

**10.** *See* Guttman, *supra* note 3. Professor Guttman asserts the words "or any other board of trade" were included only to give the CFTC

jurisdiction over futures contracts purchased and sold in the United States and executed on a foreign board of trade. He therefore concludes that CFTC jurisdiction is exclusive only as to security/commodity futures contracts entered into on a contract market designated by the CFTC. *Compare* Russo & Lyon, *supra* note 3.

**11.** *See* Affidavit of Robert L. Kassel, filed January 14, 1980.

**12.** *See* Guttman note 3 *supra* at 14–15.

registration should be permitted by any court to raise the Commission's exclusive jurisdiction as a defense against alleged violations of other statutes.[13]

In summary, numerous factors clearly demonstrate that CFTC jurisdiction, if it exists at all, is not exclusive. A realistic appraisal of the "standby with pair-off" transaction, viewing substance rather than form, compels the conclusion that it constitutes a security within the meaning of federal securities laws. Defendants' motion to dismiss based on inadequate SEC jurisdiction is therefore denied.

### III. MOTION TO COMPEL JOINDER OF THE CFTC

Defendants have moved to compel the joinder of the CFTC under Federal Rule of Civil Procedure 19(a)(1), arguing that in the absence of the CFTC, complete relief cannot be accorded among those already parties. Defendants apparently assert that they are being injured or prejudiced by the alleged ineptitude of the SEC and that they need the protection of the more "expert" CFTC in evaluating this type of enterprise.

The previous conclusions that the "standby with pair-off" is not a commodity futures contract and that the SEC clearly has jurisdiction precludes favorable consideration of defendants' motion. The Court notes additionally, however, that although the CFTC has statutory authority both to bring federal court actions and to intervene in such suits, it has specifically declined defendants' request to intervene or otherwise participate in the present case. *See* Affidavit of Robert L. Kassel, filed January 14, 1980.

### IV. MOTION TO STAY

■ Defendants seek a stay or adjournment of the proceedings in this Court pending resolution of their appeal of the preliminary injunction entered on December 5, 1979, and also pending a decision by the Supreme Court in *Securities and Exchange Commission v. Aaron*, 605 F.2d 612 (2nd Cir. 1979), which raises the issue whether scienter is a necessary element in an injunctive action brought by the Commission to enjoin violations of the antifraud provisions of the securities laws.

Federal Rule 62(a) provides that an interlocutory order granting an injunction shall not be stayed pending appeal unless otherwise ordered by the court. Under Rule 62(c) the court has discretionary power to suspend an injunction during the pendency of an appeal. This Court declines to stay or suspend the preliminary injunction or otherwise adjourn proceedings in this Court.

In *Reed v. Rhodes*, 549 F.2d 1046 (6th Cir. 1976), the court held that a party seeking a stay has the burden of proving: (1) that it is likely to succeed on the merits of the appeal, (2) that unless a stay is granted, the movant will suffer irreparable injury, (3) that no substantial harm will come to other parties, and (4) that a stay will do no harm to the public interest.

To succeed on the merits of their appeal, defendants must demonstrate that this Court abused its discretion in ordering the preliminary injunction. *Securities and Exchange Commission v. Senex Corp.*, 534 F.2d 1240 (6th Cir. 1976). Based on the evidence thus far adduced, this does not appear probable, although, of course, defendants may change the Court's view by appropriate evidence. In addition, any showing of irreparable injury is unlikely since the injunction merely orders defendants to comply with the law. For the same reason, the third and fourth requirements of the *Rhodes* test are absent.

The Court finds no justification for a stay pending possible resolution by the Supreme Court of the present split among the circuits on the scienter issue. *See, e. g., Aaron, supra*; *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978); and *SEC v. Arthur Young & Co.*, 590 F.2d 785 (9th Cir. 1979). There is no assurance that the Supreme Court will definitively resolve this dispute. In addition, the affidavits, exhibits, testimony, and other evidence presented thus far clearly indi-

---

**13.** Interpretive Letter No. 77 11, Comm.Fut.L. Rep. (CCH) ⸗ 20,466 (August 17, 1977).

cate that the actions of those defendants were not merely inadvertent, but rather seem to satisfy the Sixth Circuit requirement of recklessness. *See Mansbach v. Prescott, Ball and Turben,* 598 F.2d 1017 (6th Cir. 1979); *SEC v. Coffey,* 493 F.2d 1304 (6th Cir. 1974).

## V. EXTENSION OF PRELIMINARY INJUNCTION TO REGISTRATION VIOLATIONS

The registration provisions of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.,* require that prior to a public offering of securities, the offeror must register with the Commission and must make public disclosure of certain business and financial information relevant to the offering. In light of the earlier conclusion that the "standby with pay-off" transactions in this case were securities within the meaning of the Act, the preliminary injunction currently in effect will be expanded to prohibit subsequent violations of the registration provisions.