**Harold ELSON, Thelma Elson, Seymour Grundy, Helen Grundy and Martin Figlen, Plaintiffs,**

v.

**Harold GEIGER, Seymour Techner, and Paul Feinberg, Jointly and Severally, Defendants.**

Civ. A. No. 80–72893.

United States District Court, E. D. Michigan, S. D.

Nov. 20, 1980.

---

Julius Giarmarco, Paul Monicatti, Troy, Mich., for plaintiffs.

Howard Radner, Norman Sandles, Royce Baum, Jr., Southfield, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

On August 8, 1980, Plaintiffs filed their Complaint in the above-entitled cause, contending that a series of five transactions, which had been entered into in late 1977 and 1978, violated Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities and Exchange Act of 1934. Claiming pendent jurisdiction, Plaintiffs allege violations of the Michigan Uniform Securities Act, *Mich.Comp.Laws* §§ 451.501, 451.701, and 451.601(a), as well as common law fraud and breach of fiduciary duty.

This case is now before the Court on Motions to Dismiss by Defendants Techner and Feinberg. Defendant Geiger was served on September 2, 1980 but he has not entered an Appearance in this Court as of this date. The sole issue before this Court is whether the two loan participation agreements and the three sale and leaseback

arrangements are "securities" within the meaning of Section 2(1) of the Securities Act of 1933 and Section 3(a)(10) of the Securities and Exchange Act of 1934.

On December 23, 1977, a joint venture, in which Plaintiffs collectively owned approximately a thirty percent interest, loaned $160,000.00 to a corporation which, in turn, executed a balloon mortgage on a parcel of realty that is located at 811 Young Street, Tonowanda, New York as collateral for the loan. Thereafter, the mortgaged property was sold to a partnership which (1) guaranteed the mortgage, and (2) leased the realty back to the corporation. The current lessee is bankrupt, but Plaintiffs still hold a guaranteed mortgage interest on the Tonowanda parcel.

On September 30, 1978, a second joint venture, in which Plaintiff, Harold Elson, contributed $10,000.00, loaned $145,000.00 to a second corporation which secured the loan with an equal mortgage on five parcels of land in Erie County, New York, and one parcel in Niagara County, New York. Two months later, the corporation sold the six parcels to a New York registered partnership in which Plaintiffs own an approximate thirty-one percent interest. The partnership guaranteed the mortgage. With regard to this transaction, Plaintiffs, as partners, still own an interest in the mortgage and in a portion of the underlying land parcels which are currently occupied by the bankrupt lessee.

In addition to the above-described loan agreements, Plaintiffs also participated in three sale and leaseback arrangements. As a ten percent partner in Pine Associates, a New York registered partnership, Plaintiff Figlen purchased gas stations and executed a lease thereon to the seller corporation which is now in bankruptcy. As eighteen and eight-tenths percent partners in Niagara Car Wash Associates, a New York registered partnership, Plaintiffs purchased property in Niagara, New York, with a similar leaseback provision to the same corporate seller. As associated individuals, Plaintiffs, Seymour Grundy and Helen Grundy, purchased twenty percent of ten parcels of real property in Erie and Cattaragus Counties, New York, with similar leaseback arrangements to the same corporate seller.

In summary, Plaintiffs claim that all of the above-described transactions are securities, while Defendants argue neither "investment contracts" nor "notes" are involved inasmuch as Plaintiffs either made fully collateralized loans or bought real property.

As Justice Powell stated in his concurring opinion in *Blue Chips Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975), "The starting point in every case involving construction of a statute is the language itself."

The term "security" is defined in the Securities Act of 1933, 15 U.S.C. 77b(1), as follows:

> The term "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation of any profit-sharing agreement, collateral-trust certificate, preorganization, certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

The Securities Exchange Act of 1934, 15 U.S.C. 78c(a)(10), provides:

> The term "security" means any note, stock, treasury stock, bond debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a "securi-

ty"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

In *Tcherepnin v. Knight*, 389 U.S. 332, 335–336, 88 S.Ct. 548, 552–553, 19 L.Ed.2d 564 (1967), the Supreme Court determined that these definitions are "virtually identical."

Since neither "loan participation agreements" nor "sale and leasebacks" are explicitly included in the definitions provided, the Court must now examine the catch-all phrase, "investment contract."

There are two tests which may be applied to define the term "investment contract;" to wit, the *Howey* test and the "modern test." [1]

■ The *Howey* test, last cited in *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979), is "whether the scheme involves an investment of money in a com-mon enterprise with profits to come solely from the efforts of others." The Supreme Court in *SEC v. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946) held:

> [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . .

Although the *Howey* test has been generally unaltered since 1946, *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851–52, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) added a caveat that "the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties' " controls.

Thus, in determining whether the transactions complained of involved "securities," the Court must now determine whether Plaintiffs invested money which was "premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others," *United Housing Foundation, Inc. v. Forman*, 421 U.S. at 847–48, 95 S.Ct. at 2057–58, or whether they were loaning money with the hope that the borrower would remain sol-

---

1. The "modern test," often called the "risk capital" test, as applied in *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426 (9th Cir. 1978); *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir. 1976); and in many state courts, is broader and balances more factors. *See Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811, 13 Cal.Rptr. 186, 361 P.2d 906 (1961).

Law review commentary is generally favorable to this test, *see e. g.*, Coffey, *The Economic Realities of a Security: Is There a More Meaningful Formula*, 18 *W.Res.L.Rev.* 367 (1967), *inter alia*. Parenthetically, the approach of the Michigan courts is unclear, inasmuch as the Michigan Court of Appeals ostensibly applied the *Howey-Forman* test in *People v. Breckenridge*, 81 Mich.App. 6, 263 N.W.2d 922 (1978) while citing "risk capital" authority, i. e., *State v. Hawaii Market Center, Inc.*, 52 Haw. 642, 485 P.2d 105 (1971).

If this Court were to apply the "risk capital" test, two questions must be examined:

(1) Whether the investors derived something substantial of benefit;

(2) Whether management was principally provided by a third-party other than the investor?

The United States Court of Appeals for the Fifth Circuit tells us in *National Bank of Commerce of Dallas v. All American Assurance Co.*, 583 F.2d 1295, 1301 (5th Cir. 1978), disagreed with on other grounds, *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1029 (6th Cir. 1979), that the important factors to be weighed under the modern test include (1) amount of collateralization (a low risk factor militates against finding a "security"), (2) special facts which suggest the transaction being analyzed is more than an "ordinary loan" such as additional investment rights, no fixed repayment time or amount, and (3) emphasis on capital appreciation.

The facts in this case would not meet the definitional standards of "security" under either the traditional *Howey-Forman* test or the modern "risk capital" test. However, this Court will apply the *Howey-Forman* test.

vent in order to repay the principal with interest.

The commercial loan/investment dichotomy is explained in *C.N.S. Enterprises Inc. v. G & G Enterprises, Inc.*, 508 F.2d 1354 (7th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975), where the Court noted that every money lender places his money at risk in anticipation of a "profit" through interest payments; however, in order to come under the aegis of the Federal Securities Act, it must be shown that the instant lender is distinguishable from "every lender" and warrants the special protection which is offered by the Acts.

The cases that have been offered by the parties are instructive, but not controlling.[2]

■ In the case at bar, Plaintiffs, in concert with an optical center's employee pension trust and a retirement profit sharing trust, made fully secured loans to corporations. While it is true that "profits" may take the form of fixed interest in some circumstances, *S.E.C. v. Lake Havasu Estates*, 340 F.Supp. 1318 (D.C.Minn.1972) (residential/resort complex development with active management by developer), *accord, Los Angeles Trust Deed & Mortgage Exchange v. S.E.C.*, 285 F.2d 162 (9th Cir. 1960), *cert. denied*, 366 U.S. 919, 81 S.Ct.

1095, 6 L.Ed.2d 241 (1961), additional factors must exist before the Court can say the *Howey* test is met. No such factors are present here, particularly in light of the fact that the mortgages were personally guaranteed or assumed by the subsequent land purchaser. Plaintiffs argue that (1) the "higher than market" interest rate, (2) the pre-execution understanding that the property would be resold, and (3) the fact that the mortgagor only paid interest during the first three years of the term and retained the right to extend the due date are factors which satisfy the *Howey* standard.[3] The Court disagrees. While the repayment of the mortgage may have depended on the solvency of the borrower, this is not the same as depending on entrepreneurial efforts.

With regard to the three land purchases and subsequent leasebacks, the Court must ask again whether Plaintiffs were buying land or buying a reasonable expectation of profits from entrepreneurial efforts of others.

■ The simplest case where a land purchase may be recharacterized as a security investment is where the investor purchases undeveloped land at an inflated price with the developer's "blue-sky" promise that a

---

2. Since the cases are generally distinguishable, and not from this Circuit, the Court will merely identify the authorities which have been relied upon by the parties. Plaintiffs rely on *McClure v. First National Bank*, 497 F.2d 490, 495 (5th Cir. 1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975), for the proposition that commercial bank loans are distinguishable from private association loans, in an effort to distinguish those banking cases which were cited by Defendants, *e. g., Provident National Bank v. Frankford Trust Co.*, 468 F.Supp. 448 (E.D.Pa.1979).

The Court concludes that the same test must be applied regardless of whether a bank is involved or not. See *Marrero v. Banco di Roma*, 487 F.Supp. 568 (E.D.La.1980); *Stowell v. Ted Finkel Investment Services, Inc.*, 489 F.Supp. 1209 (S.D.Fla.1980); *Rispo v. Spring Lake News, Inc.*, 485 F.Supp. 462 (E.D.Pa.1980); *Old Sec. Life Ins. Co. v. Waugneux*, 484 F.Supp. 1302 (S.D.Fla.1980); *SEC v. G. Weeks Securities, Inc.*, 483 F.Supp. 1239 (W.D.Tenn.1980); *Berman v. Bache, Halsey, Stuart, Shields, Inc.*, 467 F.Supp. 311 (S.D.Ohio 1979).

3. Plaintiffs argue that the mortgages, in addition to being investment contracts, are also notes, citing *Lehigh Valley Trust Co. v. Central National Bank*, 409 F.2d 989 (5th Cir. 1969) (dicta) and *Movielab, Inc. v. Berkey Photo, Inc.*, 321 F.Supp. 806 (S.D.N.Y.1970), aff'd, 452 F.2d 662 (2d Cir. 1971) (publicly held company sold assets for notes).

First, both cases are inapposite. Second, just as courts have narrowed the definitional scope of the term "security" in general, the Second Circuit recently narrowed its construction of the term "note." See *Exchange Nat. Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1136 n.15 passim (2d Cir. 1976). See also, Tenth Circuit test for "note," most recently stated in *McGovern Plaza Joint Venture v. First of Denver Mortgage Investors*, 562 F.2d 645 (10th Cir. 1977) (whether the transaction is of a kind in which stock is usually given), *following Zabriske v. Lewis*, 507 F.2d 546 (10th Cir. 1974). For a current and comprehensive discussion, see Sonnenschein, *Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions*, 35 Bus.Law. 1567 (1980).

grand resort complex will soon be completed. In the instant cause, a number of geographically distant parcels were purchased. The return on investment that had been promised to the purchasers was the lessee's fixed rent payment, which was totally independent of its profits or managerial expertise. Although the Plaintiffs argued that seller-lessee's managerial ability was requisite to a continuation of the timely rental payments, this contention alone does not meet the *Howey* test. Every lessor, in some measure, is reliant upon his commercial lessee's ability to manage the business profitably; however, such reliance will not render every commercial lease a security. Furthermore, the fact that the lessor negotiated a net lease is also not dispositive.

As to the third and fourth transactions (where the land was actually owned by partnership and the Plaintiffs' interest was not directly in the land, but in the partnership), Plaintiffs cite *Pawgan v. Silverstein*, 265 F.Supp. 898, 900 (S.D.N.Y.1967), for the proposition that a venture, which has been characterized as a general partnership (where certain managing partners have retained various veto powers), should be pierced to "properly reflects its real business form." While it is true that the Plaintiffs probably did not undertake significant management roles in the various partnerships, the partnership documents, which were provided to the Court, indicate that they, though possessing the right to exercise certain managerial functions, chose not to do so.

As Defendants point out:

In both partnerships and in joint ventures, members of the group have equal rights of management and control of the enterprise. Hence when the plaintiff paid his money ..., he acquired equal rights of control of the activities of the venture. Therefore, we believe that he did not pay his money with the expectation that future profits from the venture would come solely from the efforts of others. Hence ... do not fall within the scope of the Illinois or federal securities acts.

*Polikoff v. Levy*, 55 Ill.App.2d 229, 204 N.E.2d 807, 810 (1965), *cert. denied*, 382 U.S. 903, 86 S.Ct. 237, 15 L.Ed.2d 156 (1965); *see also Fargo Partners v. Dain Corporation*, 405 F.Supp. 739 (D.N.D.1975), *aff'd*, 540 F.2d 912 (8th Cir. 1976) (sale/leaseback of apartment complex where partners had investment expertise).

While the Court agrees with Plaintiffs that the facts in *Fargo Partners* differ from these presented herein, it accepts the general rule that federal jurisdiction cannot, and should not, be extended to general partnerships, even where some of the general partners have delegated their managerial duties to others. Irrespective of the delegation, they are legally partners and have the prerogative to exercise or to not exercise managerial functions. *New York Stock Exchange v. Sloan*, 394 F.Supp. 1303 (S.D.N.Y. 1974). The Plaintiffs, who conducted their business activities with legal counsel, including a joint contribution of $207,000.00, could hardly be described as "small investors."

Applying *Howey*, the Court finds that no securities were involved in either set of transactions. As the Supreme Court stated in *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979), the term "investment contract" does not embrace every commercial transaction where lenders or purchasers have been defrauded or misled. Although the term may be flexible, *Canadian Imperial Bank of Commerce Trust Co. v. Fingland*, 615 F.2d 465 (7th Cir. 1980), Congress did not intend to open the federal courts to every alleged commercial fraud, *United Sportfishers v. Buffo*, 597 F.2d 658 (9th Cir. 1978).

For the reasons stated above, the Court finds that the interests involved herein are not "securities" and, therefore, Counts I and II are dismissed for lack of jurisdiction, pursuant to *Fed.R.Civ.P.*

12(b)(1) and 12(b)(6). Counts III through VIII are also dismissed under the doctrine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) which held, in effect, that federal claims must be substantial in order to support pendent jurisdiction over state claims. As stated in *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (2d Cir. 1974), *accord, Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1346 (8th Cir. 1980):

> If it appears that the federal claims are subject to dismissal under F.R.Civ.P. 12(b)(6) ..., the court should refrain from exercising pendent jurisdiction absent exceptional circumstances.

Inasmuch as no question of federal policy has been raised, and inasmuch as Plaintiffs are not time-barred from submitting their claims in state court, the Court finds that no "exceptional circumstances" exist herein. Accordingly, the Court determines that it will, and does, hereby refrain from exercising pendent jurisdiction in the instant cause.

IT IS ORDERED that Defendants' Motion to Dismiss as to the federal claims shall be, and is, hereby granted, *Fed.R.Civ.P.* 12(b)(1); 12(b)(6).

IT IS FURTHER ORDERED that the state claims shall be, and are, dismissed from this forum as the Court exercises its discretion to decline invoking pendent jurisdiction over those claims pursuant to the doctrine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).